PEOPLE v HALLAWAY

OPINION OF THE COURT

1. CRIMINAL LAW—LINEUP—RIGHT TO COUNSEL—CONSTITUTIONAL LAW.

United States Supreme Court decision that a lineup is a critical stage of a criminal prosecution to which the Sixth Amendment right to counsel attaches applies to preindictment cases (US Const, Am VI).

2. CRIMINAL LAW—IN-COURT IDENTIFICATION—ATTORNEY AND CLIENT.

*United States v Wade,* 388 US 218, requires a foundation to be laid in order to admit an "in-court identification" where there has been a denial of counsel; it is designed to insure the reliability of identifications.

3. CRIMINAL LAW—IN-COURT IDENTIFICATION—ATTORNEY AND CLIENT —POLICE CONDUCT.

*Gilbert v California,* 388 US 263, sets up a per se exclusionary rule prohibiting the introduction of "in-court identification" *plus* proof admitted *on direct* by the prosecution that the defendant had been identified previously, where there has been a denial of counsel no matter how reliable the evidence may be and regardless of what kind of foundation can be laid; *Gilbert*

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law §§ 313, 368.
   Admissibility of evidence of lineup identification as affected by allegedly suggestive lineup procedures, 39 ALR3d 487.
[1-4, 12] 29 Am Jur 2d, Evidence § 371 *et seq.*
   Admissibility of evidence as to extrajudicial or pretrial identification of accused, 71 ALR2d 449.
[4, 12] Admissibility of evidence of showup identification as affected by allegedly suggestive showup procedures, 39 ALR3d 791.
[5-8, 10, 11] 29 Am Jur 2d, Evidence § 493 *et seq.*
[7, 8] 29 Am Jur 2d, Evidence § 500.
[9] 58 Am Jur, Witnesses § 860 *et seq.*
   30 Am Jur 2d, Evidence § 1080 *et seq.*
[13] 29 Am Jur 2d, Evidence § 372.
[14] 29 Am Jur 2d, Evidence § 722 *et seq.*

is designed to control police conduct, not insure reliability of identification.

4. CRIMINAL LAW—SHOWUP—DUE PROCESS—IN-COURT IDENTIFICA-
TION.

Use of a one-man showup was denial of due process under the standard of *Stovall v Denno,* 388 US 293, and a foundation should be required to be laid before any in-court identification of defendant by witnesses who identified him at a one-man showup where they were not in critical condition in a hospital bed with the possibility that they would be dead before a fair showup or the trial itself.

### SEPARATE OPINION

T. E. BRENNAN and T. G. KAVANAGH, JJ.

5. EVIDENCE—HEARSAY—WORDS AND PHRASES.

*Hearsay is defined as an extra-judicial statement which is offered for the purpose of proving the truth of the thing said.*

6. EVIDENCE—HEARSAY—WITNESSES.

*The Michigan Supreme Court has not recognized an exception to the hearsay rule that it need not be applied to the extra-judicial statements of a declarant who later testifies as a witness.*

7. EVIDENCE—HEARSAY—PRIOR INCONSISTENT STATEMENTS.

*Prior inconsistent statements of a witness can be shown for impeachment purposes but this is not properly an exception to the hearsay rule because prior inconsistent statements are not admissible to prove the truth of the thing said; they are offered, rather, to prove that the inconsistent statement was in fact made, irrespective of its truth, for the purpose of impeaching contrary testimony from the witness stand.*

8. EVIDENCE—HEARSAY—WITNESSES.

*A prior extra-judicial statement of a witness which agrees with his testimony is self-serving, and is not generally permitted under any established exception to the hearsay rule.*

9. WITNESSES—EVIDENCE—CREDIBILITY—WEIGHT OF TESTIMONY.

*The law does not permit the credibility or weight of sworn testimony to be bolstered by evidence that a witness had told his story on numerous occasions, whatever weight the minds of laymen would give it.*

10. EVIDENCE—HEARSAY—WITNESSES—TRIAL—HARMLESS ERROR.

*The rule of harmless error with respect to hearsay statements is in no way related to the availability of the hearsay declarant as a witness at the trial; it is rather a rule which is applied in those instances where the out-of-court statement has no significant bearing on a disputed question of fact.*

11. WITNESSES—EVIDENCE—HEARSAY.

*The people should not have been permitted to bolster the testimony of their witness by his extra-judicial hearsay statement to an officer that one of the robbers had a deformed ear where this description was a hotly contested issue of fact.*

12. CRIMINAL LAW—SHOWUP—SELF-INCRIMINATION—CONSTITUTIONAL LAW.

*A showup does not offend the Fifth Amendment privilege against self-incrimination (US Const, Am V).*

13. CRIMINAL LAW—OBSERVATION—WITNESSES.

*Necessity existed for some kind of observation of defendant by the witnesses in the case where the police knew that defendant's car was involved in the incident, they had been led to it by the young witnesses' observation of the license number, the victims themselves could make no identification, and only the words of the young witnesses to the effect that "He is not one of the men" could have exonerated defendant.*

14. CRIMINAL LAW—EVIDENCE—WITNESSES—RES GESTAE WITNESSES—IMPEACHMENT—DISTRICT AND PROSECUTING ATTORNEYS.

*Evidence that a witness, called by the defense in support of defendant's alibi, was present at the time of the robbery was merely descriptive of the event; being part of the res gestae, the prosecuting attorney had an obligation to present it to the jury for whatever value it might have had, whether tending to incriminate or exonerate the defendant and was not impeachment on a collateral matter.*

Appeal from Court of Appeals, Division 1, R. B. Burns, P. J., and Holbrook and V. J. Brennan, JJ., affirming Recorder's Court of Detroit, Robert E. DeMascio, J. Submitted October 3, 1972. (No. 6 October Term 1972, Docket No. 53,273-1/2.) Decided March 27, 1973.

25 Mich App 604 reversed.

John Hallaway was convicted of assault with intent to rob being armed. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Reversed and remanded for new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Michael R. Mueller,* Assistant Prosecuting Attorney, for the people.

*State Appellate Defender Office* (by *Judith K. Munger,* Assistant Appellate Defender), for defendant on appeal.

WILLIAMS, J. I concur with the order reversing and remanding the case for a new trial. Regarding the second issue I concur in part and dissent in part.

I concur with Justice BRENNAN's application of the *Wade*[1]-*Gilbert*[2]-*Stovall*[3] cases to the question of the defendant's right to counsel at the showup. I would only mention separately here that the differences between *Wade* and *Gilbert* are more dramatic than what is suggested by Justice BRENNAN when he says:

"The *Wade* case in essence holds that a post indictment pretrial lineup is a critical stage of a criminal prosecution, to which the Sixth Amendment right to counsel attaches.

[1] *United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).—REPORTER.

[2] *Gilbert v California,* 388 US 263; 87 S Ct 1951; 18 L Ed 2d 1178 (1967).—REPORTER.

[3] *Stovall v Denno,* 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967). —REPORTER.

"The *Gilbert* case makes the *Wade* rule applicable to the states by way of the Fourteenth Amendment." (p 280, *infra.)*

The dramatic and fundamental difference between *Wade* and *Gilbert* is not simply that *Gilbert* applied the *Wade* case to a state prosecution. In the first place, *Wade* was not limited except by the happenstance of facts to "post indictment" identifications. Why? *Stovall* holds that *Wade* is not to be applied retroactively and *therefore* the defendant in *Stovall* would not get the benefits of *Wade—i.e.,* a lawyer at the one-man showup in the hospital room. The lineup in *Stovall* occurred hours after defendant's arrest and long before arraignment much less indictment. Unless *Wade* applies to preindictment cases, then the "retroactivity" holding of *Stovall* is dicta. That *Wade* applies to preindictment cases and that *Stovall* is not dicta is clear from legions of cases.[4]

*Gilbert* does much more than apply the *Wade* rule to a state case. The differences between *Wade* and *Gilbert* are not in to whom they apply, but in what the consequences are of not having a lawyer and then seeking to admit certain kinds of evidence of identification. *Wade* involved the courtroom identification, usually called "in-court identification". Let us call that *"Wade* evidence". *Gilbert* involved a courtroom identification *(Wade* evidence) *plus* proof admitted *on direct* by the prosecution that the defendant had been identified previously—in other words, in-court proof of an outcourt identification. Let us call that *"Gilbert* evidence".

*Wade* requires a foundation to be laid in order

---

[4] See *e.g., People v Patskan,* 387 Mich 701, 715 (1972); *People v Wilson,* 8 Mich App 651, 660 (1967); *People v Schrader,* 10 Mich App 211, 214 (1968), *leave den,* 382 Mich 768 (1969), and successor cases.

to admit *Wade* evidence where there has been a denial of counsel. *Wade* is designed to insure the reliability of identifications. *Gilbert* sets up a per se exclusionary rule prohibiting the introduction of *Gilbert* evidence where there has been a denial of counsel no matter how reliable the evidence may be and regardless of what kind of foundation can be laid. *Gilbert* is designed to control police conduct, not insure reliability of identification.

While what Justice BRENNAN says is not inconsistent with what has been written above, I believe, because this is the first time our Court has given any in-depth treatment to these cases, we should give recognition to these fundamental differences.

I dissent from that part of the second issue in which Justice BRENNAN holds that there was in this case a necessity for a "one man" showup similar to the kind of necessity which existed in *Stovall.* Justice BRENNAN recognizes that in *Stovall* the critical condition of the victim was viewed as an imperative circumstance legitimizing the use of a one-man showup. He then focuses on the part of *Stovall* which indicated the showup was crucial to the interest of the defendant since the victim was the only person who could exonerate Stovall. He then says:

"Similar necessity existed for some kind of observation of Hallaway by the witnesses in the case before us." (p 284.)

The necessity Justice BRENNAN then describes is the fact that the young witnesses were the ones who could exonerate Hallaway. The young witnesses here, however, were not in critical condition in a hospital bed with the possibility that they would be dead before a fair showup or the trial

itself and that factor in *Stovall* is what required
the use of the procedure for the interest of the
police, and that factor is what also made the use of
that showup crucial to the interest of the defend-
ant. I would hold that the use of the one-man
showup in this case was denial of due process
under the standard of *Stovall* and require a foun-
dation to be laid before any in-court identification
of the defendant by the witnesses who identified
Hallaway at the one-man showup. See *People v
Anderson,* 389 Mich 155 (1973).

T. M. KAVANAGH, C. J., and SWAINSON, J., con-
curred with WILLIAMS, J.

T. E. BRENNAN, J. On March 26, 1968, a record-
er's court jury found the defendant guilty of as-
sault with intent to rob, being armed. This appeal
raises certain claims of error in that trial.

### FACTS

In the early evening of May 24, 1967, a man
came to the door of a residence at 3127 Lakeview
Street, in the City of Detroit. Representing himself
to be from the gas company, the man was admit-
ted and directed to the basement. Shortly thereaf-
ter, two other men appeared in the house, both of
whom had stockings pulled over their heads. The
alleged gas man reappeared, armed with a gun,
and announced a holdup. The three occupants of
the home, one Delphine Baranek, her mother, and
her uncle, were directed to lie on the floor. While
the robbers were still present in the home, the
mother and uncle ran out the back door scream-
ing. Thereupon, the robbers took a small duffel bag
from one of the bedrooms and fled. The duffel bag

contained certain papers, including copies of the income tax returns of Joseph Szalapata, the uncle.

It happened that at this time there was a group of teenagers on the sidewalk on Lakeview Street, somewhere between the Baranek residence and the intersection of Lakeview and Mack Avenue. Three men had walked past them a few moments before the holdup, heading toward Charlevoix and away from Mack. The same three men were seen by the teenagers shortly thereafter, running back down Lakeview at about the same time screams and shouting were heard from the Baranek residence, and some of the teenagers began running after the fleeing men, who were observed to enter an automobile parked near the corner of Lakeview and Mack. The license number of the vehicle was observed by one of these young witnesses and was written down and later given to the police.

At approximately 2:35 in the early morning of the following day, a car of the same description, and bearing the license number observed by the teenagers, was found burned on the side of a road in Sterling Township. Inside the car a charred black bag and a two-gallon can of gasoline were found. Remnants of the income tax returns of Mr. Szalapata were found in the bag. This automobile was registered in the name of John Hallaway, the defendant in this cause.

On June 5, 1967, the defendant was arrested on a warrant issued May 31, 1967. On June 13, 1967, an examination was held in recorder's court and the defendant was bound over for trial on a charge of armed robbery.

On March 20, 1968, a trial was commenced before the Honorable Robert E. DeMascio, Recorder's Court Judge. Defendant interposed a defense of alibi and the identification of the defendant as a

participant in the felony was the principal con-
tested issue at the trial. None of the three victims
of the crime were able to identify the defendant in
court. The uncle was described as being 71 years of
age and somewhat senile. His testimony was
largely limited to identification of the charred
income tax returns.

Ronald William Rogers was called as a witness.
He was 11 years old at the time of the trial. On
the day of the robbery, he lived about eight houses
from the Baraneks. He testified that he was play-
ing ball in front of a boy-friend's house; that three
men had walked past him in one direction; that
about 20 minutes later, the three men returned
and were running in the opposite direction. He
stated that he got a good look at one of the men,
remembering that he had small ears. Then the
following occurred:

"*Q.* All right, do you see that man in this courtroom?
"*A.* Yes.
"*Q.* Would you point him out, please.
"*A.* Him. (Mr. Weiswasser [assistant prosecuting at-
torney]: Let the record show that the witness has
identified the defendant, John A. Hallaway.)"

On cross-examination, it was brought out that
during his testimony at the preliminary examina-
tion, the witness Rogers had not mentioned any
peculiarity with respect to the ears of the man he
had observed on Lakeview Street. It was also
brought out that the witness had observed the
defendant at the police station on the Sunday
preceding the preliminary examination. That
would be June 11, 1967. This observation was
made through a one-way glass partition. Further
cross-examining the witness Rogers, defense coun-
sel asked:

"*Q.* The day that you were at the police station, and you were asked to look through this glass, you identified Mr. Hallaway, didn't you?

"*A.* Yes.

"*Q.* And some of your friends did not identify him?

"*A.* Yes, some of them didn't."

Thereafter, Robert Brown was called as a witness. He was 16 years old and was one of the teenagers on the street at the time of the robbery. Brown also testified as to the movements of the three men and, like Rogers, stated that a deformity in one of the men's ears had attracted his attention at the time. Brown related writing down the license number of the vehicle and, after describing the event, was asked the following question by the assistant prosecuting attorney:

"*Q.* Now, do you see any of those men in the courtroom?

"*A.* Over there. (Mr. Weiswasser: Let the record show that the witness is identifying the defendant, John Hallaway.)"

The witness Brown also testified on cross-examination that he, too, had seen the defendant at the police station on Sunday, June 11, 1967, through a one-way glass, and that he recognized the defendant on that occasion.

Defense counsel asked these questions:

"*Q.* When you looked through the one-way glass on that Sunday at police headquarters, how many men did you see in that room?

"*A.* I just seen the one. That is all that I was paying attention to because the guy said look at that guy sitting down and see if it is him. That is all that I paid attention to.

"*Q.* Did you tell him it wasn't him or it was him?

"*A.* I said it was."

On redirect examination, witness Brown was asked about a conversation he had had with a police officer a few days after the event. Without objection, he was asked whether he had told the officer anything about one of the robbers having a deformed ear. Brown could not remember having made such a statement. It was also brought out on further cross-examination that the witness Brown had not mentioned a deformed ear at his testimony at the preliminary examination.

It was at this point of the trial that Officer John Sokolosky was called to the stand. He testified to having answered a radio run to the Lakeview address on May 24, 1967, and that during his investigation there, he spoke to two witnesses, Robert Brown and one, Bernard Gambrell. The officer stated that the witnesses had given him a description of the holdup men, their vehicle, and its license number. He was asked to relate the description he had been given by the witnesses. Defense counsel objected on the ground of hearsay. After colloquy between the court and counsel, the court overruled the objection and permitted the officer to testify as to the description he had been given by the witnesses.

## FIRST ISSUE

Hearsay. It is claimed on appeal that a prejudicial error was committed by the trial judge in overruling the objection and permitting the officer to testify as to the description given him by the witnesses.

Hearsay is defined as an extra-judicial statement which is offered for the purpose of proving the truth of the thing said. While some writers have suggested that the hearsay rule need not be applied to the extra-judicial statements of a declar-

ant, who later testifies as a witness, this Court has not recognized such an exception to the hearsay rule. Of course, prior inconsistent statements of a witness can be shown for impeachment purposes. But this is not properly an exception to the hearsay rule. Prior inconsistent statements are not admissible to prove the truth of the thing said. They are offered, rather, to prove that the inconsistent statement was in fact made, irrespective of its truth, for the purpose of impeaching contrary testimony from the witness stand. Where the prior extra-judicial statement of a witness agrees with his testimony, the out-of-court remark is self-serving, and is not generally permitted under any established exception to the hearsay rule.

During the cross-examination of witness Brown, defense counsel probed for prior inconsistent statements. He was certainly entitled to do this. He was entitled even to show that details of the witness' testimony were omitted from previously given accounts of the incident by the witness. Certainly, if Brown had not been a witness, it would have been clearly inadmissible for the officer to relate Brown's extra-judicial description of the robber.

If the officer's testimony was offered for the purpose of proving the truth of the thing said, that is, for the purpose of proving that one of the robbers had a deformed ear, then the statement is obviously hearsay and obviously self-serving. But it is suggested that against the background of other inquiry into prior statements of the witness, it is competent to show that the witness made a prior consistent statement and that in such case the extra-judicial statement is offered not directly to prove the truth of the thing said, but rather merely to prove the fact of his having made a

prior consistent statement. Whatever weight the minds of laymen would give to evidence that the witness has told his story on numerous occasions, the law does not permit the credibility or weight of sworn testimony to be thus bolstered.

Justice COOLEY, in *Stewart v People,* 23 Mich 63 (1871), held that a prior consistent statement of a witness may be admitted where a prior inconsistent statement has been put in evidence, and the prior consistent statement is of such character as to be probative upon the issue of whether or not the prior inconsistent statement was in fact made. But COOLEY was careful to point out that such statements should not generally be received.

In the case at bar, no prior inconsistent statement of the witness Brown was laid in evidence. The most that might be said of his cross-examination was that it elicited an omission in previous testimony.

But the people argue that the testimony of the officer, though hearsay, is harmless and not prejudicial. Citing several decisions of this Court, specifically *People v Gregory,* 130 Mich 522 (1902); *People v Hawks,* 206 Mich 233 (1919); and *People v Kregger,* 335 Mich 457 (1953). These cases are supposed by the people to stand for the proposition that hearsay corroborated by the testimony of the out-of-court declarant may be admitted in evidence without prejudicial error.

The *Gregory* case involved testimony by a policeman to the effect that the defendant's wife had told him that a certain room was her room. The report of the case does not disclose whether the wife ever testified in court. It holds, however, that the erroneously received hearsay was not prejudicial since other evidence clearly established ownership of the room.

*People v Hawks* was a rather unusual case in which an accomplice, who had turned state's evidence, was permitted to refresh his recollection from a letter he had written to the judge. The trial court itself directed the exhibit to be marked and admitted in evidence for the purpose of clarifying to all concerned that the communication to the judge was unsolicited.

In *People v Kregger,* the hearsay statement was made by the defendant's wife for whose murder the defendant was on trial. While concluding that the statement was hearsay, the Court held it not to be prejudicial since all of the material facts in the wife's statement had been admitted in a formal statement by the defendant. The *Kregger* case cites several precedents from other jurisdictions, all of which confirm that the rule of harmless error with respect to hearsay statements is in no way related to the availability of the hearsay declarant as a witness at the trial. It is rather a rule which is applied in those instances where the out-of-court statement has no significant bearing on a disputed question of fact.

Two examples are *Halfrich v State,* 122 Fla 375; 165 So 285 (1936), where a hearsay statement that the defendant "was killing a man and wife" was held non-prejudicial where, "[a]ccording to defendant's testimony, that was exactly what he was doing at the time," and *State v Brodock,* 53 Mont 463; 164 P 658 (1917), where a hearsay statement that the defendant claimed ownership of certain cattle was held non-prejudicial where the defense to a charge of larceny was ownership of the cattle.

In the context of the case before us, it would not have been prejudicial error for Officer Sokolosky to relate that a witness had told him that one of the robbers had a deformed ear if the defendant con-

ceded that one of the robbers had a deformed ear.
But the defense did not concede the truth of this
description. It was a hotly contested issue of fact
and the people should not have been permitted to
bolster the testimony of their witness by his extra-
judicial hearsay statement to the officer.

Having concluded that the trial judge committed
prejudicial and reversible error with respect to
this first issue, requiring remand for a new trial,
we discuss the other issues raised only insofar as
they may be cause for further dispute upon the
retrial.

## Second Issue

Showup. Defendant claims that the pretrial
identification procedure to which he was subjected
was so suggestive as to be conducive to mistaken
identification, thus requiring exclusion of all iden-
tification testimony having basis in the pretrial
showup. The record shows that the defendant was
represented by counsel at the time of the showup.
The record also shows that defendant's lawyer had
advised the defendant not to participate in a
lineup without him, and while the matter was
contested, there was evidence before the trial
judge from which he could fairly have concluded
that counsel refused to cooperate with the police
by attending a lineup or consenting to the defend-
ant's participation in a lineup.

Again, resolving disputed questions of fact as the
trial judge is presumed to have done, the showup
consisted of placing the defendant in a room with-
out handcuffs and in the company of one or more
plain-clothes police officers. The potential wit-
nesses, some 11 in number, were brought in groups
of 2 or 3 to the sheltered side of a one-way glass
wall, and were asked to observe and identify the

defendant. Three of these 11 witnesses were able to recognize the defendant in that fashion. One witness, Gene Fournier, did not attend the showup, but identified the defendant in court. It is conceded that this pretrial identification procedure occurred on Sunday, June 11, 1967, the day before the decision by the United States Supreme Court in *United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967); and *Gilbert v California,* 388 US 263; 87 S Ct 1951; 18 L Ed 2d 1178 (1967); and *Stovall v Denno,* 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967).

The *Wade* case in essence holds that a post indictment pretrial lineup is a critical stage of a criminal prosecution, to which the Sixth Amendment right to counsel attaches.

The *Gilbert* case makes the *Wade* rule applicable to the states by way of the Fourteenth Amendment.

And *Stovall v Denno* holds that the *Wade* and *Gilbert* cases are to be applied prospectively only.

Despite the fact that the showup in the instant case occurred prior to *Wade, Gilbert,* and *Stovall,* the right to counsel is not at issue here. Defendant Hallaway had a lawyer. Indeed, he had been advised by counsel not to participate in a lineup, and counsel had refused to attend a lineup.

Does it follow in such circumstances that no pretrial identification procedure can be held? We know of no authority which holds that the people are obliged to abstain from all pretrial identification under such circumstances.

The *Wade* case itself sets forth:

"We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of

the accused to give evidence having testimonial signifi-
cance."

Even if this case had occurred subsequent to
June 12, 1967, there would be no doubt of the
people's right to permit pretrial observation of the
defendant. The only question would be whether
such identification could proceed in the absence of
counsel, where counsel has expressly refused to
participate.

We will no doubt be required, as time goes
along, to address ourselves to this and the other
problems created by the *Wade* decision.

What are the rights and duties of counsel who
attend a lineup? Is he merely an impartial ob-
server? In such case, a lawyer, particularly the
defendant's own trial counsel, is not nearly as
useful as would be a cameraman or a court stenog-
rapher. Is counsel to object to the form of the
lineup? Is he to cross-examine the identifying wit-
ness? Is he permitted to bring other persons and
insist that they be presented side by side with his
client? Whatever the answers to these questions,
we must measure the validity of the showup in
this case against certain language in *Stovall v
Denno.*

*Stovall* involved a so-called one-man showup,
wherein the defendant was taken to a hospital
room in the company of several police officers, and
exhibited to a complaining witness who was in
critical condition. The defendant Stovall was the
only black man in the group. The Supreme Court
of the United States held that a confrontation
antedating *Wade* and *Gilbert* might nonetheless be
attacked on the ground that it was so unnecessar-
ily suggestive and conducive to irreparable mis-
taken identification as to be a denial of due proc-
ess of law. *Stovall* notes that the practice of show-

ing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. The Court, nonetheless, upheld Mr. Stovall's conviction on the ground that the showup, despite its suggestive nature, was under all the circumstances imperative.

Cases decided since *Stovall*, moreover, have not applied the *Stovall* language in any definitive way. *Neil v Biggers,* — US —; 93 S Ct 375; 34 L Ed 401 (1972), held a one-man showup is not per se a violation of due process, and held the particular showup at issue in that case not to be a violation of due process under all of the circumstances. Language in that opinion suggests that the United States Supreme Court is not disposed to expand the quoted *Stovall* test for pre-*Wade* cases.

*Biggers* characterizes the *Stovall* language thus:

"[W]hen we first gave notice that the suggestiveness of confrontation procedures was anything other than a matter to be argued to the jury."

And the Court in *Biggers* points out:

"The only case to date in which this Court has found identification procedures to be violative of due process is *Foster v California,* 394 U.S. 440, 442 [89 S Ct 1127; 22 L Ed 2d 402] (1969). There, the witness failed to identify Foster the first time he confronted him, despite a suggestive lineup. The police then arranged a showup, at which the witness could make only a tentative identification. Ultimately, at yet another confrontation, this time a lineup, the witness was able to muster a definite identification. We held all of the identifications inadmissible, observing that the identifications were 'all but inevitable' under the circumstances. 394 U.S., at 443.

"In the most recent case of *Coleman v Alabama,* 399 U.S. 1 [90 S Ct 1999; 26 L Ed 2d 419] (1970), we held

admissible an in-court identification by a witness who had a fleeting but 'real good look' at his assailant in the headlights of a passing car. The witness testified at a pretrial suppression hearing that he identified one of the petitioners among the participants in the lineup before the police placed the participants in a formal line. JUSTICE BRENNAN for four members of the Court stated that this evidence could support a finding that the in-court identification was 'entirely based upon observations at the time of the assault and not at all induced by the conduct of the lineup.' 399 U.S., at 5–6."

The ambivalence of *Stovall* only demonstrates the difficulty of trying to adapt the Federal Constitution for use as a handbook for police procedures. Indeed, if there is any identification procedure which is suggestive, it is that which is used daily in open court. With the defendant sitting at the table, next to his lawyer, and the lawyer being clearly recognizable from his participation in the lawsuit, only the most imperceptive witness would be unable to identify the person whom the police and the prosecutor have accused.

It would be ridiculous in the extreme to impugn the identification testimony of witness Brown because of the pretrial showup which he attended without at the same time questioning the validity of the identification of the witness Fournier who saw the defendant only in court. Indeed, as between the two, it could well be argued that the pretrial identification was less suggestive and less conducive to mistake than the in-court identification. Of 11 witnesses, only 3 were able to recognize the defendant. It would follow either that the procedure was not very suggestive or that the other eight were not very amenable to suggestion. Without the pressure of the courtroom scene or demand for immediate response, the witnesses at the showup were able to bring more calm delibera-

tion and recollection to their task than would have been the case had they merely been asked to make the identification in court.

It is important to place this discussion in prospective. A showup does not offend the Fifth Amendment privilege against self-incrimination. On June 11, 1967, a showup without benefit of counsel was no infringement upon the Sixth Amendment's right to be represented. The challenged courtroom identification in this case, therefore, can only be excluded if it was based upon the pretrial identification, and if the pretrial identification procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law.

In *Stovall*, the critical condition of the victim was viewed as an imperative circumstance warranting an admittedly suggestive showup. The *Stovall* Court quotes the Court of Appeals, moreover, upon the point that the suggestive showup was crucial to the interest of the defendant as well:

"Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, 'He is not the man' could have resulted in freedom for Stovall * * * ."

Similar necessity existed for some kind of observation of Hallaway by the witnesses in the case before us.

The police knew that Hallaway's car was involved in the incident. They had been led to it by the young witnesses' observation of the license number. The duffel bag and tax return were found in it. The gasoline can and the fire suggested an attempt to destroy evidence. The victims themselves could make no identification. Only the

Opinion by T. E. BRENNAN, J.

words of the young witnesses to the effect that "He is not one of the men" could have exonerated Hallaway, and directed the police to operate upon the theory that Hallaway's car had been stolen, or at least used by someone else on the day of the robbery.

## THIRD ISSUE

Identification of a defense witness as an accomplice. Further recitation of facts is necessary to establish a basis for discussion of the third issue.

The defendant testified that he had gone to the race track on the day of the robbery after having parked his car near a tavern; that after the races, he and one, Turnbau, visited several bars and ended up in Toledo, Ohio, where the defendant stayed until June 5.

Defendant denied complicity in the robbery, and stated that he had no knowledge of how his automobile came to be burned and left in Sterling Township, or how the complaining witness' tax return and duffel bag came to be found therein.

The defense then called Roy Hallaway, defendant's brother, whose testimony in support of the alibi consisted in the main of describing a telephone call from the defendant, in which the defendant told his brother that he was out of town. Roy Hallaway further denied having seen the defendant's car for some time before the defendant was arrested.

Thereafter, one of the people's witnesses, Gene Fournier, was recalled to the stand. He testified that Roy Hallaway, the defendant's brother, was also one of the three men whom he had seen walking up and running down Lakeview Street on the day of the robbery.

Counsel for the defendant at first agreed that such evidence was proper rebuttal, then objected to its introduction as being irrelevant and prejudicial to the defendant's case.

It is urged on appeal that the identification of Roy Hallaway constituted impeachment upon a collateral matter.

We disagree.

Evidence to the effect that the witness, Roy Hallaway, was present at the time of the robbery was merely descriptive of the event. Being part of the res gestae, the prosecuting attorney had an obligation to present it to the jury for whatever value it might have had, whether tending to incriminate or exonerate the defendant.

"The only legitimate object of the prosecution is, 'to show the whole transaction, as it was, whether its tendency be to establish guilt or innocence.'" *Hurd v People,* 25 Mich 405 (1872).

The conviction is reversed and the cause is remanded for new trial.

T. G. KAVANAGH, J. concurred with T. E. BRENNAN, J.

LEVIN and M. S. COLEMAN, JJ., did not sit in this case.