PEOPLE v McRAFT

Docket No. 46087. Submitted October 1, 1980, at Detroit.—Decided December 2, 1980. Leave to appeal applied for.

Gail Y. McRaft was convicted of assault with intent to rob and steal while armed and assault with intent to do great bodily harm less than murder, Detroit Recorder's Court, Justin C. Ravitz, J. She appeals, alleging that the trial court erred in admitting tracking-dog evidence without a necessary foundation having been laid or without giving any cautionary instruction relative thereto, in failing to suppress identification evidence, by allowing the prosecution to prejudicially characterize certain evidence, in allowing the prosecution to comment on defense counsel's closing argument, and in allowing the prosecution to elicit testimony regarding defendant's failure to answer certain questions asked by a police officer near the scene of the crime, and that her convictions were violative of double jeopardy protections. *Held:*

1. Defendant did not object timely to a lack of proper foundation for the admission of tracking-dog evidence in the trial court and, thus, failed to preserve the issue for review.

2. The trial court erred in failing *sua sponte* to instruct the jury regarding its consideration of the tracking-dog evidence, but the error was harmless beyond a reasonable doubt.

3. The trial court properly admitted identification testimony against defendant. The identification procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

4. The prosecutor commented legitimately on the evidence

REFERENCES FOR POINTS IN HEADNOTES

[1] 30 Am Jur 2d, Evidence § 1146.
 75 Am Jur 2d, Trial § 747.
 Evidence of trailing by dogs in criminal cases. 18 ALR3d 1221.
[2] 29 Am Jur 2d, Evidence §§ 371, 785.
 Admissibility of evidence of photographic identification as affected by allegedly suggestive identification procedure. 39 ALR3d 1000.
[3] 75 Am Jur 2d, Trial § 241.
[4] 75 Am Jur 2d, Trial §§ 260-264.
[5] 6 Am Jur 2d, Assault and Battery § 64.
 21 Am Jur 2d, Criminal Law § 189.

and explained to the jury what he believed the evidence implied.

5. The prosecutor did not impermissibly comment on defense counsel's closing remarks, and any prejudicial effect could have been rectified by a curative instruction requested upon a timely objection.

6. The prosecutor's questioning regarding defendant's failure to respond to a police officer's questions near the scene of the crime constituted error, but the error was harmless.

7. Defendant's conviction for separate offenses arising out of the same criminal transaction do not violate the constitutional prohibition against double jeopardy.

Affirmed.

1. CRIMINAL LAW — TRACKING-DOG EVIDENCE — JURY INSTRUCTIONS.

A trial court should apprise a jury, even in the absence of a request for instruction by defense counsel, in a case in which tracking-dog evidence is admitted against a defendant that such evidence should be considered with caution, is of slight probative value, and, if found reliable, cannot support a conviction in the absence of other direct evidence of guilt.

2. CRIMINAL LAW — IDENTIFICATION — FAIRNESS OF PROCEDURE — WITNESSES.

The fairness of an identification procedure of a suspect in a criminal case should be evaluated in light of the totality of the circumstances; the test is the degree of suggestion inherent in the manner in which a suspect's photograph is presented to a witness for identification.

3. PROSECUTING ATTORNEYS — COMMENTARY ON EVIDENCE.

A comment by a prosecutor during closing argument that evidence against a defendant is uncontroverted does not deny the defendant a fair trial and is not improper where such comment is true.

4. PROSECUTING ATTORNEYS — COMMENTARY ON EVIDENCE.

A prosecutor may comment legitimately on evidence adduced during a trial and explain to a jury what he believes that evidence implies.

5. CRIMINAL LAW — SINGLE CRIMINAL TRANSACTIONS — MULTIPLE CONVICTIONS — DOUBLE JEOPARDY — CONSTITUTIONAL LAW.

Convictions for assault with intent to rob and steal while armed and assault with intent to do great bodily harm less than murder which arise from the same criminal transaction do not violate the constitutional prohibition against double jeopardy (US Const, Am V, Const 1963, art 1, § 15).

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

*Gail Rodwan,* Assistant State Appellate Defender, for defendant on appeal.

Before: J. H. GILLIS, P.J., and BASHARA and CYNAR, JJ.

CYNAR, J. Defendant was convicted of assault with intent to rob and steal, being armed, MCL 750.89; MSA 28.284, and of assault with intent to do great bodily harm less than murder, MCL 750.84; MSA 28.279, and was sentenced to from 10 to 20 years imprisonment on the former conviction and from 6 years 8 months to 10 years imprisonment on the latter, said sentences to run concurrently. Defendant appeals as of right.

The complaining witness, Louis Barrow, testified that, on the afternoon of December 11, 1978, he entered a small store in the area of St. Clair and Mack in the City of Detroit, purchased four bottles of pop, paid for the pop with a $50 bill, and received $48 in change. He further testified that he was in the neighborhood that day doing ministerial work for the Jehovah's Witnesses. Mr. Barrow testified that Ms. McRaft was also in the store and that she apparently noted his receipt of the $48. He testified that he left the store and walked to his car, drove a short distance, and was waiting at the traffic light at the corner of Mack and Hastings when someone, whom he identified as the defendant, opened the passenger door and entered the car. Continuing his testimony, he said that she told him to give her his money and, that when he

answered that he had no money, she stated that she would "cut off [his] mother fucking head". The complainant testified that he had observed that she had her hands inside the pockets of her jacket and that he "figured she had something", however, he saw no weapon at that time. Mr. Barrow related that the assailant then "hit" him in the throat and fled, and that, though he was bleeding profusely from his wound, complainant did not know until later that the instrument used was believed to be a knife. Mr. Barrow described his wound and exhibited the scar on his neck to the jury.

Mr. Barrow testified that he was in intensive care for approximately two days, and that at some point, possibly the day after his admission, the police came to his hospital room and showed him some photographs. He testified that he identified defendant from the group of seven photographs shown to him by the police.

Previously, at defendant's preliminary examination, Mr. Barrow gave the following testimony regarding the photographic showup:

"Q. How long were you in the hospital before you were shown the photographs? Do you remember how many days?

"A. If I don't make a mistake I thought they showed them to me the next day. I'm not sure but, you know, with a person losing that much blood he's lucky to have any senses at all, because I was so weak I couldn't stand up.

"Q. If I can just paraphrase what you said, were you pretty—you were pretty—you were going in and out of consciousness at that time and you were not all that coherent?

"A. You mean when he showed me the pictures?

"Q. Yes, that next day after—.

"A. Well, I don't know how many pints of blood you

got in your body, but the doctor told me afterwards—because I asked him how many pints of blood did I lose—and he said, 'You lost five pints.'

"Q. So the very next day then the sergeant came and showed you some photographs?

"A. That's right. I'm pretty sure it was the next day."

Prosecution witness Donald Penny testified during trial that he observed an automobile parked on the corner of Mack and St. Jean at the time of the incident in question and that he observed two people in the car. He stated that the two occupants had appeared to be struggling. He identified defendant as the female occupant of the car.

Detroit Police Officer Roger McGee testified that he was at the police mini-station at Mack and St. Jean on the afternoon of December 11 when he saw the injured complainant crossing the street, and that he observed another officer begin to chase a suspect and that he followed in pursuit. He further testified that, in a nearby alley, he observed the defendant coming from the rear of a building, breathing heavily, and that, after attempting to question the defendant in the alley, he placed her under arrest. Officer McGee testified that, after the arrest, he returned to the alley and discovered a pocket knife. Tracking-dog evidence regarding the knife was introduced at trial. The officer had apparently left the knife in place; it was later "re-discovered" by a tracking dog and admitted as an exhibit. However, the dog's handler, officer Michael Kenley, had been hospitalized due to a nervous breakdown and was unable to testify. The prosecutor asked that he be allowed to present officer Kenley's supervisor, officer John Dunkin, to establish the qualifications of both the handler and the dog.

A due diligence hearing was held, and the court

determined that the prosecutor had exercised due diligence in attempting to produce officer Kenley. Officer Dunkin was permitted to testify as to the general qualifications of officer Kenley and his dog. Officer James Younger, the person in charge of the crime scene, was permitted to testify as to the dog's behavior at the time in question. He stated that the dog "sniffed up" a pocket knife adjacent to a building "a few feet out of the alley" into which the assailant had fled. Detroit evidence technician, William Lagore, testified that no attempt was made to obtain fingerprints from the knife.

The trial judge deferred ruling on the prosecutor's initial request that the knife be admitted into evidence. Defense counsel argued that the prosecutor had failed to tie the knife to any particular crime and stated: "I would have to have a continuing objection to that".

Defense counsel moved for a directed verdict on the charge of assault with intent to rob, being armed, arguing that the prosecutor had failed to prove the weapon element of the offense; the motion was denied. At no point in the trial did the court caution the jury as to the weight or credibility to be afforded tracking-dog evidence.

Defendant did not present witnesses or testify in her own behalf.

Defendant raises a number of issues on appeal. Defendant first claims that the trial court erred in admitting tracking-dog evidence without the necessary foundation therefor first being established or without giving any cautionary instruction relative thereto. The evidence admitted by the trial court included a knife, purported to be the weapon involved in the criminal transaction. No objection was made in the court below to the admission of

the knife into evidence on the ground that a proper foundation for its admission had not been established. Since any error relative thereto could have cured upon timely objection by defendant, we find the issue not to be preserved for appellate review. *People v Harris,* 64 Mich App 503, 508-509; 236 NW2d 118 (1975). The knife, itself, was sufficiently connected with defendant by other tracking-dog evidence so as to allow its admission into evidence. *People v Williams,* 46 `Mich App 165, 171-172; 207 NW2d 480 (1973), *lv den* 389 Mich 813 (1973).

As to the trial court's failure, *sua sponte,* to give a cautionary instruction regarding the tracking-dog evidence, we are unpersuaded that any error occasioned thereby necessitates reversal. Assuming, *arguendo,* that the Court's holding in *People v Perryman,* 89 Mich App 516, 524; 280 NW2d 579 (1979),[1] applied to the trial of the defendant herein, the court's error in failng to comply with its duty to instruct on tracking-dog evidence, even in the absence of any request therefor, is subject to the application of the two-pronged test for harmless error. Under the first inquiry involved in that standard, we do not perceive this error to be so offensive to the maintenance of a sound judicial process that it could never be regarded as harmless. *People v Robinson,* 386 Mich 551, 563; 194 NW2d 709 (1972), *inter alia.* The error here was not deliberately injected into the proceedings by the prosecutor. It did not deny defendant a fundamental element of the adversary process, nor was it of a particularly inflammatory or persuasive

---

[1] *Perryman, supra,* 524, held that, from the date the opinion was filed, trial courts have a duty, even absent a request by counsel, to apprise the jury that tracking-dog evidence "must be considered with caution; is of slight probative value; and if found reliable, cannot support a conviction in the absence of other direct evidence of guilt."

kind. See *People v Swan,* 56 Mich App 22, 31-32; 223 NW2d 346 (1974), *lv den* 395 Mich 810 (1975). Moreover, *Perryman, supra,* was decided less than three weeks prior to defendant's trial which indicates, in all likelihood, a lack of awareness of its existence on the part of the trial judge. This fact reinforces our conclusion that the first prong of the harmless-error test was not offended.

Under the second part of the standard, we declare a belief that the error was harmless beyond a reasonable doubt. *Robinson, supra.* We find no reasonable possibility that the error complained of might have contributed to the conviction, *i.e.,* that it helped to convince an otherwise undecided juror of defendant's guilt beyond a reasonable doubt. *Swan, supra,* 33. The proofs, aside from the taint of error, were so compelling that all reasonable jurors would find guilt beyond a reasonable doubt, even if the instruction had been given.

Next, we address defendant's argument that the complainant's weakened condition at the time of the photographic showup gave rise to a very substantial likelihood of misidentification, requiring suppression of the identification made thereat. The failure to so suppress this evidence mandates reversal, according to defendant. We disagree.

Defendant's argument focuses on a single factor in arguing that an impermissible level of suggestiveness was present. As stated by the Court in *People v Lee,* 391 Mich 618, 626; 218 NW2d 655 (1974):

"The fairness of the identification procedure must be evaluated in the light of the totality of the circumstances. *The test is the degree of suggestion inherent in the manner in which the suspect's photograph is presented to the witness for identification."* (Emphasis supplied.)

No claim is made that the procedure involved in this case was otherwise tainted in any fashion. The photographs, themselves, are not challenged, nor is the sequence and/or manner in which they were presented to the witness. The complainant's detailed recollection of the photographic showup convinces us that he was not so weakened that he failed to comprehend what was transpiring.[2] We

---

[2] At defendant's preliminary examination the complainant gave the following account of the photographic showup:

"Q [Mr. Horn, the prosecutor] What did he [the sergeant] say when he brought you these photographs?

"A [Mr. Barrow, the complainant] He asked me—he first showed me two more of the photographs and he said, 'Is this the one?' And I said, 'Huh-uh, that's not the one.' It was lighter-complexioned [sic]. When he showed me this one I said, 'That dark lady right there; that's the one right there.' See that lady right there—

"Q So he handed them to you one at a time—

"A He handed them to me one at a time—I told him I wanted to get my glasses to make for sure that I wasn't identifying the wrong individual. But I wouldn't forget her face before Judgment, no, sir.

"Q Okay, Was anybody else present at the time?

"A At the time—

"Q Was anybody else in the hospital room at the time?

"A There was a gentleman—they was doing something to him, anyway, but he was an old man, anyway—

"Q I don't mean patients, I mean anybody with the sergeant.

"A No. He came—as far as I seen, I didn't see a nurse or nobody in there but him when he come to the bedside. I guess they gave him preference to come in and question me about the situation.

"Q Did he happen to say anything to you while he was showing you the pictures?

"A If I remember correctly— I don't know if I'm quoting him exactly right, but he said, 'Would you remember? Could you identify her if I showed you a portrait of her?' And I said, 'Sure I could.' I said I could identify her with the picture, I could identify her by face, anywhere. I said, 'Anybody come near dying as I did, I wouldn't forget that.'

"Q You said that hers was the second picture you saw?

"A I didn't say hers was the second picture, I said hers was the last picture. He showed me two pictures before he showed me her picture.

"Q So he showed you two and then he showed you hers—

"A And I said, 'This is the one right here.'

"Q That was the last picture?

"A That was the last picture. Ask him so that you know that the truth is being told.

"Q Do you remember pretty much what the other pictures looked like?

conclude that the identification procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Lee, supra,* 626. The identification testimony was properly admitted, and the fact of Mr. Barrow's weakened condition went to the weight of the evidence, not its admissibility.

Defendant's contention that she was denied a fair trial when the prosecutor stated, in closing argument, that the evidence against defendant was uncontroverted is devoid of merit. Such commentary is not improper in any respect, if true. *People v White,* 401 Mich 482, 512; 247 NW2d 912 (1977), *inter alia.* No claim that the statement was not true in this case has been brought forward by defendant.

Likewise, we fail to find the prosecutor's characterization of defendant's act of puncturing the complainant's throat with a knife as a "slashing" of his throat a sufficient ground for reversal. As we deem the use of the word "slash" to be the prosecutor's method for describing the savage nature of the attack, we find it permissible commentary on the evidence adduced at trial. *People v Joshua,* 32 Mich App 581, 586-587; 189 NW2d 105 (1971), *lv den* 386 Mich 758 (1971), *cert den* 409 US 853; 93 S Ct 183; 34 L Ed 2d 96 (1972). The identical resolution is compelled with respect to defendant's claim that the prosecutor mischaracterized the testimony of Donald Penny. A prosecutor may comment legitimately on the evidence and explain to the jury what he believes that evidence implies. *Joshua, supra.*

Defendant's claim that the prosecution made

"A Well, both the other two pictures were lighter-complected, just like you're lighter than I am, do you understand? I'm lighter than she is; do you understand? I don't forget faces, not that fast; that's my job everyday. I'm on disability, see."

unfounded suggestions to the jury that defense counsel's closing argument contained comments denigrating the complainant's religious beliefs and mocking him because of his cleft palate is not entirely borne out by the record. The record clearly establishes defense counsel's comments relative to the complainant's religious beliefs. Insofar as the prosecution's response to those defense remarks is concerned, no error at all occurred. *People v Pomranky,* 62 Mich App 304, 311; 233 NW2d 263 (1975), *lv den* 397 Mich 823 (1976).

Although the record does not contain any remarks of defense counsel mocking the complainant for having a cleft palate and a speech impediment,[3] any prejudicial effect caused by the prosecution's remarks assailing defense counsel therefor could have been rectified by a curative instruction if one had been requested upon a timely objection. *People v Hall,* 396 Mich 650, 655; 242 NW2d 377 (1976). The prosecution's reference to this was brief and unembellished. Therefore, we decline to find reversible error on this basis.

Defendant also predicates reversible error upon the prosecution's eliciting of testimony concerning defendant's failure to answer questions asked of her by a police officer upon the officer encountering her in an alley near the scene of the attack on Mr. Barrow. In support of her argument, defendant cites *People v Bobo,* 390 Mich 355; 212 NW2d 190 (1973). While the prosecutor's questioning was undoubtedly error under *Bobo,* we find such error to be harmless on the facts of this case. *Swan, supra,* 30-35.

As a final argument, defendant contends that

---

[3] The record does contain remarks by defense counsel relating to a perceived penchant for hyperbole on the part of Mr. Barrow, as well as an uncanny (perhaps incredible) ability to recall minute details surrounding the incident.

her two convictions were violative of double jeopardy protections contained in the United States and Michigan constitutions.[4] We are constrained to disagree with defendant's position. In a virtually indistinguishable situation, an identical claim was rejected previously by this Court. *People v Bryan,* 92 Mich App 208, 224; 284 NW2d 765 (1979), *lv den* 408 Mich 914 (1980). We agree with the *Bryan* Court and likewise reject the claim of the defendant in the case at bar.

We find no error necessitating reversal or remand in the instant case and, therefore, affirm defendant's convictions and sentences.

Affirmed.

---

[4] US Const, Am V, Const 1963, art 1, § 15.