# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DEQUANTA JOVAN HUDSON,

Defendant-Appellant.

UNPUBLISHED
March 10, 2016

No. 325035
Wayne Circuit Court
LC No. 14-004733-FC

Before: M. J. KELLY, P.J., and CAVANAGH and SHAPIRO, JJ.

PER CURIAM.

Defendant, Dequanta Jovan Hudson, appeals by right his jury convictions of first-degree murder, MCL 750.316(1)(a), possession of a firearm by a felon, MCL 750.224f, and possession of a firearm during the commission of a felony (felony firearm), MCL 750.227b. The trial court sentenced him to serve life in prison without the possibility of parole for his murder conviction, to serve 40 to 60 months in prison for his felon-in-possession conviction, and to serve 5 years in prison for his felony firearm conviction. Because we conclude there were no errors warranting relief, we affirm.

## I. BASIC FACTS

Riccardo Martin and Jermayne Fuller testified that they were with Allen Shackleford at a well-known "hang-out area" when, shortly before dark, Hudson drove up in a gray Cadillac and waited for some time. Fuller asked who Hudson was and Shackleford answered. Martin also responded to the question and identified him as "Tay." Hudson responded, "[O]kay I'll show yaw mother f***ers I'll be back." He then drove away.

Fuller felt threatened, but the group went back to what they were doing. After 30 to 40 minutes, Shackleford and some friends walked to the corner store. Fuller followed a couple of steps behind because he was "still paranoid." Martin stated that, as he came out of the store, Hudson was there on foot. He fell in step with Martin and said, "[L]et me holler at you." As Martin and Hudson walked to the corner, Hudson said, "You been knowing me all my," but did not finish the sentence because, as they turned the corner, he saw Shackleford. Hudson immediately pulled a gun. He said to Shackleford, "[t]hat tough shit you was on." Shackleford replied, "I wasn't on no tough shit with you." Hudson struggled with Shackleford and one or

-1-

two shots were fired. Shackleford fell to the ground with a fatal gunshot wound to the head. Hudson said, "[D]on't tell on me" and ran away.

After hearing all the evidence, the jury found Hudson guilty of first-degree murder, being a felon-in-possession, and felony firearm. Hudson now appeals in this Court.

## II. PREMEDITATION

### A. STANDARDS OF REVIEW

Hudson first argues that the evidence was insufficient to establish premeditation. This Court reviews a challenge to the sufficiency of the evidence by reviewing the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found, on the basis of that evidence, that the prosecutor proved the essential elements of the crime beyond a reasonable doubt. *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009).

### B. ANALYSIS

In order to establish first-degree murder, the prosecution had to present evidence that Hudson intended to kill Shackleford and that he did so with premeditation and deliberation. *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). " 'To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem.' " *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998), quoting *People v Morrin*, 31 Mich App 301, 329-330; 187 NW2d 434 (1971). The thought process involved must be " 'undisturbed by hot blood.' " *Id.* In other words, " 'the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a "second look." ' " *Id.*

"Circumstantial evidence and reasonable inferences drawn from the evidence may constitute satisfactory proof of premeditation and deliberation." *People v Unger*, 278 Mich App 210, 229; 749 NW2d 272 (2008). The inferences, however, must be supported by the record; otherwise they are merely speculation. *People v Johnson*, 93 Mich App 667, 672; 287 NW2d 311 (1979), recognizing disagreement not in relevant part *People v Williams*, 422 Mich 381, 387 n 2; 373 NW2d 567 (1985). Factors to be considered include "(1) the previous relationship of the parties; (2) defendant's actions prior to the actual killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *Id.* at 674.

Hudson argues that the confrontation that led to the shooting was spontaneous; specifically, he maintains that, at best, his remark was a show of bravado, not evidence of premeditation. Courts have held that it is insufficient to establish premeditation and deliberation when the killing occurred during a sudden fight, unless there was a pause in the action after which the defendant chose to continue the attack. See *Morrin*, 31 Mich App at 329-331, 331 n 47. There was no pause in the action in this case once the physical altercation started. However, the altercation was not a sudden fight.

-2-

The evidence showed that Hudson had earlier told Shackleford and his friends that he was coming back to show them all. The evidence that he left, but not before warning that he would return, permitted an inference that Hudson left for a reason related to his threat—namely, to arm himself. See *People v Crawford*, 30 Mich App 221, 222; 186 NW2d 90 (1971). The evidence also showed that he returned and confronted Shackleford's friends; the fact that Hudson returned belies his argument that this statement was merely bravado. Moreover, when he saw Shackleford after his return, he immediately drew his gun and told Shackleford "[t]hat tough shit you was on." From this, a reasonable jury could infer that Hudson returned with the intent to use the gun. It could also reasonably infer that Hudson immediately drew his gun on Shackleford and exclaimed that Shackleford was on "tough shit" because he intended to shoot Shackleford. That there was evidence that Shackleford and Hudson struggled did not alter the fact that there was evidence from which the jury could infer that Hudson intended to kill Shackleford even before the struggle.[1] See *Unger*, 278 Mich App at 228-229 (noting that the jury is free to believe or disbelieve, in whole or in part, any of the evidence presented at trial).

There was sufficient evidence from which a reasonable jury could find beyond a reasonable doubt that Hudson killed Shackleford with premeditation and deliberation.

## III. WILLIAMS' TESTIMONY

### A. STANDARDS OF REVIEW

Hudson next argues that the trial court erred in several respects when it allowed officer Douglas Williams to testify that Crystal Johnson identified Hudson. This Court reviews for an abuse of discretion a trial court's decision to permit testimony. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). A trial court abuses its discretion when its decision "does not fall within the range of reasonable and principled outcomes." *People v Young*, 276 Mich App 446, 448; 740 NW2d 347 (2007). This Court, however, reviews de novo questions of law, such as the proper interpretation and application of the rules of evidence and questions of constitutional law. *People v Lane*, 308 Mich App 38, 51; 862 NW2d 446 (2014); *People v Rose*, 289 Mich App 499, 505; 808 NW2d 301 (2010).

### B. HEARSAY

Hudson argues that Williams' testimony about Johnson's identification was inadmissible hearsay. At trial, Williams testified that he canvassed nearby residences as part of the investigation that evening. He obtained a six-person photographic lineup, and showed it to some residents. He stated that Crystal Johnson identified Hudson from the photos and told him that Hudson normally drove a white Ford Explorer, but that night he was driving a gray Cadillac. Johnson did not testify at any point in the proceedings. The trial court admitted this testimony over Hudson's hearsay objection for the limited purpose of establishing why the investigation proceeded as it did.

---

[1] Testimony by the medical examiner also supported a finding that the fatal gunshot was not fired during a mutual struggle as there was no evidence of close range firing.

"'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). An out-of-court statement is not hearsay, however, if it is presented to show its effect on a police officer's conduct of a criminal investigation, because it is not offered for the truth of the statement itself. *People v Knolton*, 86 Mich App 424, 429; 272 NW2d 669 (1978). Such testimony should generally be limited to the fact that statements were made that affected the course of the investigation; any prejudicial information should be omitted. *Id*.

In *People v Garcia*, 31 Mich App 447; 187 NW2d 711 (1971), a police officer testified about a radio communication that he had received, informing him that windows were being broken at a fire station. The trial court allowed the testimony over a hearsay objection so that the prosecution could establish why the officer went to the fire station. We held that the statement about the radio communication was not hearsay because it was offered to show why the officer went to the fire station, not to establish that the defendant had broken windows. *Id*. at 455.

In this case, Williams similarly testified that Johnson made several statements; including picking Hudson out from a photo lineup and stating that he had been seen driving a white Ford Explorer, but that day was driving a gray Cadillac. In response to Hudson's hearsay objection, the prosecutor represented that the statements were made to show why the officers continued the investigation as they did from that point. Under the circumstances, the trial court's acceptance of that explanation was within the range of principled outcomes. *Young*, 276 Mich App at 448.

Even if we were to conclude that this testimony was inadmissible, any error would not warrant relief. See *People v Bartlett*, 231 Mich App 139, 159-160; 585 NW2d 341 (1998). Both Fuller and Martin identified Hudson from the photo lineup, and both testified that he normally drove a white Explorer, but drove a gray Cadillac on the day at issue. Both additionally identified him in court. Given this testimony, the admission of the statement—even if erroneous—was harmless.

## C. CONFRONTATION

Hudson next argues that the admission of Johnson's statement deprived him of his right to confront the witnesses against him and prejudiced his trial. Because this claim of error was not preserved, we must review it for plain error affecting substantial rights. *People v Walker (On Remand)*, 273 Mich App 56, 65-66; 728 NW2d 902 (2006). Hudson has the burden to establish that the error prejudiced him by affecting the outcome of the proceedings. *Id*. at 66.

Assuming that Williams' testimony about Johnson's identification of Hudson violated Hudson's right to confront the witness against him, see *Crawford v Washington*, 541 US 36, 68; 124 S Ct 1354; 158 L Ed 2d 177 (2004), we conclude that the error was harmless. As already noted, both Fuller and Martin testified that they saw Hudson stop in the gray Cadillac, heard the words exchanged, and heard him say he'd be back to "show them" right before he drove away. Martin additionally testified that he was walking and talking with Hudson immediately before he saw him shoot and kill Shackleford. In the face of this testimony, any error was harmless.

-4-

## D. OPINION TESTIMONY

Hudson next argues that Williams improperly expressed his opinion that he was guilty when he testified that he learned that the person described as the perpetrator and identified as "Tay" during the initial canvass was Hudson. Unless a defendant enters a valid plea, it is for the jury to decide whether a defendant is guilty or not guilty. Witnesses cannot express their opinions on whether a defendant is guilty. *People v Bragdon*, 142 Mich App 197, 199; 369 NW2d 208 (1985). This Court has, however, held that officers who testified that they became suspicious of the defendant based on facts elicited by the prosecuting attorney were not expressing their opinions, but merely explaining the investigative process. *People v Heft*, 299 Mich App 69, 81-83; 829 NW2d 266 (2012).

At trial, Williams testified about the investigation that led to Hudson's arrest:

> *Q*. And do you recall the description that they give [sic] you of this individual?
>
> *A*. Black male, medium complexion, wearing braids had braids wearing a pink hat. Had a winter jacket on.
>
> *Q*. Okay. Um, and did you get a name at any point in time?
>
> *A:* They called him Tay.
>
> *Q:* Did you ever learn who Tay was?
>
> *A:* Yes, eventually.
>
> *Q:* Who did you come to learn that Tay was?
>
> *A:* Dequanta Hudson.

Williams' testimony did not amount to an opinion as to whether Hudson was guilty. Instead, he testified as to facts: the fact that witnesses identified the shooter as Tay and that he subsequently learned that Hudson was known by that name. Because Williams testified about facts, not opinions, Hudson's argument has no merit.

## E. PRIOR ACTS

Hudson also argues that Williams violated MRE 404(b) when he testified that he was given additional information about Hudson "from a previous case," and that during his canvass people were reluctant to go on the record because they were afraid of Hudson. MRE 404(b) generally prohibits the introduction of other acts evidence to prove character: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Our Supreme Court has explained that, "by its plain terms, MRE 404(b) only applies to evidence of crimes, wrongs, or acts 'other' than the 'conduct at issue in the case' that risks an impermissible character-to-conduct inference." *People v Jackson*, 498 Mich 246, 262; 869 NW2d 253 (2015).

Although Williams mentioned another case and indicated that potential witnesses were afraid of Hudson, he did not testify about any specific prior acts. Without testimony of a particular crime, a particular wrong, or a particular act, there is nothing from which to draw an impermissible inference. See *People v Mardlin*, 487 Mich 609, 616 n 10; 790 NW2d 607 (2010). Although this testimony might have been objectionable on other grounds, it did not violate MRE 404.

## IV. OTHER EVIDENTIARY ERRORS

## A. THE GUN

Hudson next argues that testimony regarding the .22-caliber Derringer was irrelevant and highly prejudicial. After officers found the Derringer in the house in which they arrested Hudson, it was sent to the forensics lab along with the two shell casings found at the scene and the bullet that was recovered from Shackleford's head. Expert testimony at trial established that the Derringer could not have fired either of the casings found at the scene or the bullet recovered from Shackleford. One of the shells was a .38-caliber, one was a .40-caliber, and the bullet was too damaged to identify but weighed too much to have been anything less than a .30-caliber. Hudson's trial lawyer did not object to this testimony. Therefore, we review this evidentiary issue for plain error. *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004).

Evidence of other acts may be admitted notwithstanding MRE 404(b)(1) if, in relevant part, the evidence was offered for a purpose other than to prove the defendant's propensity to commit crimes and was relevant to a fact or issue of consequence to the offense charged under MRE 402. See *People v VanderVliet*, 444 Mich 52, 74; 508 NW2d 114 (1993). The Derringer recovered was not the type of gun used, nor was it apparently relevant to any other fact or issue in the case.[2] As such, there was no proper purpose for the testimony.

Nevertheless, Hudson is not entitled to relief as a result of this error. The concern about other acts evidence is that the jury might convict a defendant for one crime because it is assumed from the other acts evidence that the defendant had a propensity to commit crimes. See *People v DerMartzex*, 390 Mich 410, 413; 213 NW2d 97 (1973). In this case, even if no reference had ever been made to the Derringer, the jury would have known that Hudson had committed prior acts that resulted in his conviction of a felony that made it illegal for him to possess a firearm in Michigan. The jury heard the parties stipulate that Hudson was ineligible to possess a firearm at the time this crime was committed because he had been "convicted of a prior specified felony," and the prosecutor repeated that information in the closing statement. Moreover, although the jury might draw an adverse inference as a result of the evidence that he possessed a different firearm, it is highly unlikely that this evidence prejudiced his trial given the strong evidence that he used a different firearm to shoot and kill Shackleford. The error was harmless.

---

[2] Because the jury found Hudson guilty of first-degree murder by shooting Shackleford, the jurors clearly found that Hudson possessed a different firearm on the day of the crime.

## B. THE SWEATSHIRT

Hudson next argues that the sweatshirt to which an explosives-detecting dog alerted as having gunpowder residue on the sleeve should not have been admitted under MRE 702. Because Hudson's lawyer did not object to the testimony about the explosives dog evidence when it was offered, we shall review this claim of error for plain error. *Knox*, 469 Mich at 508.

Two days after the shooting, officers arrested Hudson and searched the house. ATF Agent Jason Salerno assisted in the search with a dog, Jax. Salerno testified that he has been working with Jax for two years. Jax was trained to alert to explosives, including bullets, shell casings, firearms and gun powder residue. Both handler and dog must be certified annually with a score of 100%, or the dog is removed from the program. While searching the home, Jax alerted to a suit and officers found a .22-caliber Derringer in the suit's pocket. Salerno testified that the dog also alerted on an extra-large, gray sweatshirt that was draped over a chair in the living room. The dog alerted specifically on the right sleeve. Officer Tanya Eaton identified the sweatshirt as the one she saw Hudson wearing earlier on the day of his arrest. The sweatshirt was entered into evidence. No evidence was offered of the sweatshirt having been laboratory tested for gunshot residue.

We addressed the admissibility of evidence concerning tracking dogs in criminal trials for the first time in *People v Harper*, 43 Mich App 500, 508; 204 NW2d 263 (1972). The Court in *Harper* established that evidence concerning tracking dogs is admissible if it can be shown, as a condition precedent, that "(1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and, (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it." *Id*. In *Harper*, the dog handler's testimony established that both dog and handler had undergone extensive training and were accurate in tracking people, the handler put the dog on the defendant's trail "where the perpetrator of the rape left the victim's home," and the trail was fresh enough that the dog was competent to follow it. *Id*. We held that a proper foundation had been laid for the tracking-dog evidence, and therefore the trial court had not erred by admitting this evidence. *Id*.

Seven years after *Harper*, we held that trial courts have a duty, even without a request from defense counsel, "to inform the jury that tracking dog evidence: must be considered with caution; is of slight probative value; and if found reliable, cannot support a conviction in the absence of other direct evidence of guilt." *People v Perryman*, 89 Mich App 516, 524; 280 NW2d 579 (1979).

This Court recently adapted the *Harper* test to apply to cadaver dog evidence. *Lane*, 308 Mich App 38. The defendant in *Lane* was tried for first-degree child abuse and first-degree felony murder in the death of his two-year-old daughter, although the child's body had not been found. *Id*. at 42. However, two days after the defendant reported that someone had carjacked his car and taken his daughter, an FBI cadaver dog alerted to the defendant's car from among 31 cars in a warehouse, to the child's car seat and blanket separately in a room full of many types of objects, and to a room in the defendant's house containing two bunk beds. *Id*. at 49.

The defendant moved to exclude the cadaver dog evidence under MRE 702. *Id*. at 50. At an evidentiary hearing, it was established that there is no way to test for human remains in order to corroborate a cadaver dog's response. The dog's training reports were submitted into evidence, and they established that the dog gave no false responses, either negative or positive, in 49 tests in a controlled environment. *Id*. Two days before and two days after the dog responded to the car, blanket, car seat and bedroom in the *Lane* case, he tested at 100% correct responses. He was also tested "a variety of times" about six weeks later over about a month's time, and scored 100% in all but one test, in which he tested at 95% to 100%. *Id*. at 51. The trial court allowed the cadaver dog evidence, and "instructed the jury to consider the cadaver dog evidence carefully and not to convict [the defendant] solely on that basis." *Id*.

This Court affirmed, holding that the trial court had not erred in applying the four-part test set forth in *Harper* to cadaver dogs. *Id*. at 54. We reasoned that "cadaver dog evidence is not significantly different from other forms of tracking dog evidence," in that "[t]racking dogs and cadaver dogs both use a precise sense of smell to identify scents that are outside the range of human ability to detect." *Id*. at 53. The Court further held:

> [C]adaver dog evidence is sufficiently reliable under *Daubert*[3] and *Gilbert*[4] if the proponent of the evidence establishes the foundation that (1) the handler was qualified to use the dog, (2) the dog was trained and accurate in identifying human remains, (3) circumstantial evidence corroborates the dog's identification, and (4) the evidence was not so stale or contaminated as to make it beyond the dog's competency to identify it. [*Id*. at 54.]

Because the prosecutor in *Lane* "established a sufficient foundation to admit the cadaver dog evidence," the trial court "did not abuse its discretion by admitting the evidence under MRE 702. *Id*. at 54-55.

Explosive detection canines such as Jax—commonly used as bomb dogs—also "use a precise sense of smell to identify scents that are outside the range of human ability to detect." See *Id*. at 53. There is no discernible difference in abstract terms of reliability between a handler taking a cadaver dog to a house and having it alert to the odor of decomposition in a particular room, and a handler taking an explosives dog to a house and having it alert to the sleeve of a sweatshirt. We have already held that the requirements of *Daubert* and *Gilbert* are satisfied if the foundation for the cadaver dog evidence is established using the four criteria set forth in *Lane* as adapted from *Harper*. *Id*. at 54. Therefore, we decline Hudson's invitation to adopt a rule that other states apply to the use of accelerant-detecting dogs in arson cases to govern the use of explosives-detecting dogs in Michigan.

---

[3] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[4] *Gilbert v DaimlerChrysler Corp*, 470 Mich 749; 685 NW2d 391 (2004).

Instead, we hold that the cadaver dog test applies, as adapted to evidence regarding explosives dogs. Explosives dog evidence is sufficiently reliable under *Daubert* and *Gilbert* if the proponent of the evidence establishes the foundation that (1) the handler was qualified to use the dog, (2) the dog was trained and accurate in identifying explosives, (3) circumstantial evidence corroborates the dog's identification, and (4) the evidence was not so stale or contaminated as to make it beyond the dog's competency to identify it. As with tracking dogs, trial courts must instruct the jury, even if not requested, that this evidence may be of slight probative value, and even if found reliable, cannot support a conviction without other direct evidence of guilt. See *Perryman*, 89 Mich App at 524.

Under this adapted test, the prosecution in this case established the minimum required foundation for the explosives dog evidence. Salerno's testimony established that both he and Jax were trained and tested annually to detect explosives such as gunpowder residue, and Jax would not be in the program if he had not tested at 100% accuracy annually for at least two years. And Eaton's testimony corroborated that the sweatshirt was worn by Hudson earlier on the day of his arrest (and possibly under the "winter coat" he was described as wearing during the incident). While Salerno did not testify specifically about how long a trained dog can smell gunpowder residue on clothing, only two days had passed since the crime. Two days had passed in *Lane* as well, and we held there that the foundation for the evidence had been sufficiently established. See *Lane*, 308 Mich App at 49, 54-55. The foundation established in this case was at least minimally sufficient, and therefore, the trial court did not abuse its discretion in admitting this evidence, especially considering that Hudson did not object.

Hudson did not argue that he was entitled to relief because the trial judge did not *sua sponte* give the jury instruction regarding dog-related evidence required under *Perryman*, but in any case, this error was harmless. Shortly after *Perryman* was decided, we held in *People v McRaft*, 102 Mich App 204, 210; 301 NW2d 852 (1980), that failure to give the prescribed cautionary instructions regarding tracking dog evidence was harmless error. We explained that we reached this conclusion because the error was not "deliberately injected into the proceedings by the prosecutor," because "[i]t did not deny defendant a fundamental element of the adversary process," and because "it was not of a particularly inflammatory or persuasive kind." *Id*. at 210-211. We reached the same conclusion in *People v McMillen*, 126 Mich App 211; 336 NW2d 895 (1983).

Here, Hudson neither objected to the admission of the evidence nor requested a limiting instruction, the prosecutor mentioned it in the closing argument but in a matter-of-fact way rather than an inflammatory way, and there was other, strong evidence identifying Hudson as the perpetrator of the crime, particularly the eyewitness testimony of Martin, who knew Hudson before the shooting and was able to identify him. The trial court did not abuse its discretion in admitting the dog-related evidence, and the court's failure to give the required limiting instruction to the jury was harmless error.

## V. INEFFECTIVE ASSISTANCE

Hudson next argues that he did not receive the effective assistance of counsel. Because the trial court did not hold a hearing on this claim, our review is limited to the record as it exists. *People v Snider*, 239 Mich App 393, 423; 608 NW2d 502 (2000). This Court reviews de novo

whether the acts or omissions at issue amounted to ineffective assistance of counsel. *People v Douglas*, 496 Mich 557, 566; 852 NW2d 587 (2014).

In order to prevail on an ineffective assistance of counsel claim, a defendant must show that "(1) the performance of counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." *Plummer*, 229 Mich App at 307. The defendant bears the heavy burden of rebutting the presumption that his counsel's assistance was effective, as well as that the action challenged was a product of sound trial strategy. *Id.* at 308.

Hudson first argues that his trial lawyer's failure to specifically object to William's testimony about Johnson's out-of-court identification on hearsay grounds amounted to ineffective assistance. As we have already explained, the trial court did not abuse its discretion in holding that this testimony was not hearsay because it was not offered for the truth of the matter asserted. A defense counsel "is not expected to raise meritless objections." *People v Torres (On Remand)*, 222 Mich App 411, 425; 564 NW2d 149 (1997).

Hudson next argues that his lawyer was ineffective because she failed to object to Williams' testimony that he received additional information about Hudson "from a previous case" as improper opinion testimony regarding Hudson's guilt, and to his statement that, during his initial canvass, people were reluctant to go on the record because they were afraid of him. As discussed, the challenged testimony was not opinion evidence because it contained no expression of Williams's belief or judgment about Hudson's guilt. Nor would an objection under MRE 404(b)(1) to the other statement have succeeded, as discussed, because Williams' testimony did not contain any facts from which the jury could have made an improper inference. Again, Hudson's lawyer had no duty to bring meritless objections. *Torres*, 222 Mich App at 425.

Finally, Hudson argues that his lawyer was ineffective because she failed to make a pretrial motion to suppress evidence concerning the Derringer and the sweatshirt and failed to object when the evidence was given at trial. The prosecutor established a proper foundation for the admission of the sweatshirt. Failing to object to admissible evidence does not amount to ineffective assistance. *Snider*, 239 Mich App at 425. The Derringer, in contrast, had no relevance and may have been precluded had there been an objection. The failure to object, however, could have been a matter of trial strategy. While it is true that the jury could have inferred from the Derringer that Hudson had a propensity to commit crimes with guns, it seems just as likely that the jury would view it as exculpatory because the expert testimony established absolutely that it was not the murder weapon and it was the only weapon found. Hudson, therefore, has failed to overcome the presumption that his lawyer's decision was a matter of sound trial strategy. See *Plummer*, 229 Mich App at 308.

Hudson has not established that his lawyer was ineffective.

## VI. PROSECUTORIAL ERROR

Finally, Hudson argues that he is entitled to a new trial on the basis of prosecutorial error. Hudson failed to preserve this issue by timely and specifically objecting, so our review is for

plain error. *Unger*, 278 Mich App at 234-235. The ultimate question is whether Hudson received a fair and impartial trial. *People v Brown*, 267 Mich App 141, 152; 703 NW2d 230 (2005). We review claims of prosecutorial error on a case-by-case basis. *Id.* A reviewing court must examine a prosecutor's alleged improper remarks in context, and they must be "evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *Id*. Prosecutors are normally afforded great latitude in their conduct and their arguments and conduct during trial. *Unger*, 278 Mich App at 236. "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id*. at 235 (citation and quotation marks omitted).

Hudson contends that the prosecutor improperly elicited opinion and character testimony from Williams. However, as we previously noted, Williams' testimony did not contain either his opinion on Hudson's guilt or facts concerning prior acts. Prosecutorial error may not be premised "on a prosecutor's good-faith effort to admit evidence." *People v Dobek*, 274 Mich App 58, 76; 732 NW2d 546 (2007).

The prosecutor's decision to ask Williams whether people had been reluctant to speak with him during his initial canvass is more troubling, especially when the officer responded, "nobody wanted to go on record," and she asked him what he meant by that. He then elaborated, "Nobody wanted to put it on paper, nobody wanted to get involved they were scared of him. Um, a lot of people had kids in the area so they did not want to be involved." While this did not amount to prior acts evidence, it may have been ruled more prejudicial than probative had Hudson's lawyer objected. "A prosecutor may not inject unfounded and prejudicial innuendo into a trial." *Id*. at 79. The testimony that the prosecutor elicited in this instance improperly suggested that defendant had a violent character. See *Id*. at 79-80.

However, viewed in the context of the whole trial, this comment was not outcome-determinative. Two witnesses testified that they heard Hudson threaten to come back and "show" them, and one stated that he was talking with Hudson moments before Hudson saw Shackleford, pulled his gun, exchanged words, struggled with him, and then shot him. Additionally, the jury may have concluded that the neighbors would have been reluctant to testify under those circumstances no matter who the purported perpetrator had been, because of the seriousness and circumstances of the crime. These "relatively brief" comments "did not likely deflect the jury's attention from the evidence presented in this case." See *Unger*, 278 Mich App at 237. Moreover, "[c]urative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements," and this Court does not "find error justifying reversal where a curative instruction could have alleviated any prejudicial effect." *Id*. at 235. Here, a timely instruction would have cured any minimal prejudice.

There were no errors warranting a new trial.

Affirmed.

/s/ Michael J. Kelly
/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro

-11-