# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

ELISAH KYLE THOMAS,

      Defendant-Appellee.

UNPUBLISHED
December 8, 2016

No. 326311
Wayne Circuit Court
LC No. 14-009512-FC

Before: GADOLA P.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

The prosecution appeals as of right an order dismissing charges of armed robbery, MCL 750.529, assault with intent to commit murder, MCL 750.83, assault with intent to do great bodily harm less than murder, MCL 750.84, carrying a dangerous weapon with unlawful intent, MCL 750.226, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and carrying a concealed weapon, MCL 750.227. We reverse and remand.

On October 17, 2014, an assailant robbed and then shot the victim in this case. The victim had just left his grandmother's house and was walking down a street in the city of Detroit on his way to a Coney Island restaurant when he passed a man. The victim purchased food at the Coney Island, then walked to a nearby convenience store and gas station where he purchased a soda. He left the gas station and continued walking. About fifteen minutes after first seeing the man on the street, the same man approached the victim, pulled a nine millimeter handgun from his waist area, pointed the gun at the victim's chest, and demanded that the victim give him everything in his pocket. The victim gave the assailant $10, but the assailant demanded more. The assailant then fired two shots, one at the ground and one in the air, and began to feel in the victim's pocket. The victim pushed the assailant and ran. When he made it across the street, the victim turned and threw his soda at the assailant. The assailant chased the victim and fired two more shots, hitting the victim in the left leg with the fourth shot. The victim was able to make his way to his church nearby where his pastor called the police.

The victim was taken to the hospital shortly thereafter. Before being put in the ambulance, the victim told police that the assailant was dark-skinned, was about the victim's own size, being 5 feet 9 inches tall and about 145 pounds, and had been wearing a black hood. Detroit police officer Samellia Howell responded to the scene of the shooting and obtained the victim's description of the assailant from other officers. She canvased the area and saw

-1-

defendant, who matched the description, near a gas station across the street from the scene of the shooting. Howell stopped defendant, patted him down for weapons, and ran his name through the Law Enforcement Information Network (LEIN), learning that defendant did not have any convictions or outstanding warrants. Howell took a photograph with her cell phone of defendant in front of the gas station. She did not arrest defendant, believing that she did not have probable cause.

Howell arrived at the hospital approximately five to ten minutes later, and asked the victim to describe the assailant. According to Howell, the victim said that the assailant was a black male, approximately 5 feet 9 inches tall and 200 pounds, between 15 and 20 years old, and wearing dark clothing. The victim did not recall whether the assailant had any facial hair. Howell believed that the description matched defendant. Howell then showed the victim the photograph on her cell phone that she had just taken of defendant and asked the victim "was this him?"[1] The victim started to cry and within seconds stated "that's him" thereby identifying defendant as the assailant.

Defendant was arrested and charged with armed robbery, assault with intent to murder, assault with intent to do great bodily harm less than murder, carrying a concealed weapon, carrying a weapon with unlawful intent, and felony-firearm. At the preliminary examination before the district court, the victim testified that the assault took place between 8:00 p.m. and 9:00 p.m., that it was dark out and there was little lighting, and that the assailant was wearing all black with a hood that was worn up, obscuring the assailant's hair but not his face. The victim could not discern if the assailant had facial hair. The victim further testified that the gun was a black and gray nine millimeter handgun and that the assailant held it in his right hand. He further testified that the robbery happened "so fast my adrenalin was up." The district court bound defendant over as charged.

Before the trial court, defendant moved to suppress the photographic identification at the hospital, arguing that it was impermissibly suggestive and thereby violated defendant's right to due process. Defendant further moved to suppress the victim's later in-court identification of defendant, arguing that there was no independent basis to support the in-court identification, which was tainted by the earlier photographic identification. The trial court agreed, suppressed both identifications, and dismissed all charges against defendant.

On appeal, the prosecution argues that the circuit court improperly suppressed the victim's identifications of defendant. We agree.

A trial court's determination in a suppression hearing regarding the admission of identification evidence will generally not be reversed unless clearly erroneous. *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013). More specifically, when reviewing a trial court's ruling on a motion to suppress, we review de novo the trial court's rulings on questions of law and on constitutional issues considered in the motion. *People v Keller*, 479

---

[1] When asked what her exact words were, Howell testified "I didn't say was this the guy who shot you. I said was this him? I showed him the picture and he said, that's him, that's him."

Mich 467, 473-474; 739 NW2d 505 (2007). We review the trial court's findings of fact for clear error. *People v Jenkins*, 472 Mich 26, 31; 691 NW2d 759 (2005). We find clear error to exist if we are left with a definite and firm conviction that a mistake was made. *McDade*, 301 Mich App at 356. The trial court's application of constitutional standards is not entitled to the same deference given to factual findings, however.[2] *Jenkins*, 472 Mich at 31.

In this case, the trial court granted defendant's motion to suppress the photographic identification determining that it was so suggestive that it violated defendant's right to due process. Whether a photographic identification procedure violates due process, US Const, Ams V, XIV; Const 1963, art 1, § 17, depends upon the totality of the circumstances. *People v Woolfolk*, 304 Mich App 450, 457; 848 NW2d 169 (2014). When a photographic identification procedure is so impermissibly suggestive that it creates a substantial likelihood of misidentification the procedure violates the defendant's right to due process. *Id*. The defendant, however, bears the burden of proof on the issue. See *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.)

Showing a witness a single photograph is considered to be one of the most suggestive photographic identification procedures. *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998). Improper suggestibility may occur when a person is in some way singled out, such as when the police suggest to the witness that the police have apprehended the right person. *Id*. But a one-person confrontation is not per se a violation of due process, *People v Hallaway*, 389 Mich 265, 282; 205 NW2d 451 (1973), and may be a reasonable police practice to immediately determine whether the suspect is connected with the crime.[3] See *People v Winters*, 225 Mich App 718, 725, 728; 571 NW2d 763 (1997).

The relevant inquiry is whether the identification procedure was unduly suggestive in light of all of the surrounding circumstances,[4] including (1) the opportunity of the witness to

---

[2] The dissent argues that we overlook the standard of review because we do not specify which of the trial court's findings of fact were clearly erroneous. That standard would only be applicable were there a dispute regarding the factual findings. Here, the parties do not argue, and we do not conclude, that the trial court's findings of fact were erroneous; indeed, the parties essentially agree regarding the facts. Rather, the question before this Court is whether the trial court correctly applied the law to those facts, necessitating de novo review.

[3] The dissent notes testimony that Howell was not familiar with Detroit Police Department photographic identification procedures. This argument presents a "red herring." The only question for purposes of our analysis is whether under these circumstances the identification procedure used was unduly suggestive. We are not called upon to explore the knowledge base of the officer; even if Howell had been thoroughly informed of the department's procedures, the events remain the same, and our analysis would be the same.

[4] Contrary to the assertion of the dissent, we have not overlooked the lack of Michigan case law directly on point with this case. If such a case existed our task would be much simpler. In the absence of a case directly controlling this issue, we must analyze the facts of this case in light of the authority that does exist.

view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Kurylczyk*, 443 Mich at 306 (opinion by GRIFFIN, J.). The question is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v Biggers*, 409 US 188, 199; 93 S Ct 375; 34 L Ed 2d 401 (1972).

For example, in *Woolfolk*, 304 Mich App at 457-458, this Court concluded that showing a single photo of the defendant to the witness did not create a substantial likelihood of misidentification where the witness had already identified the shooter by a nickname, the witness knew and had grown up with the shooter, and the photo was only used to help confirm the person's identity. By contrast, in *Gray*, 457 Mich at 111, this Court concluded that the identification procedure was highly suggestive when the police showed a single photo of the defendant to the victim and told her that "this was the man the police had arrested for the assault."

In *People v McAllilster*, 241 Mich App 466, 472; 616 NW2d 203 (2000), remanded in part on other grounds 465 Mich 884 (2001), this Court concluded that the showing of a single photo of the defendant was suggestive, but permissible. The police officer involved testified that he had not been able to locate a mug shot of the defendant and only had a photo of the defendant on a boat, and thus, this Court reasoned, any photographic lineup would also have been impermissibly suggestive because it would have singled out the defendant. *Id*. This Court permitted the identification, but reasoned that there was an independent basis for the identification. *Id*. at 472-473.

Similarly, in *People v McRaft*, 102 Mich App 204, 211, 212 n 2; 301 NW2d 852 (1980), this Court permitted a photographic identification where the hospitalized victim was handed photographs one at a time by a police sergeant who asked "Is this the one?" Upon seeing the second photograph, the victim identified the person as the assailant. Although the issue before this Court in *McRaft* was whether the victim was healthy enough to make a valid identification, and not a challenge to the procedure used by police, this Court did not find the identification procedure to be impermissibly suggestive even though the victim had only been shown 2 photographs. *Id*.

Thus, although the showing of a single photograph is virtually always suggestive, to determine whether the showing of the single photo in this case was so impermissibly suggestive that it violated defendant's right to due process, we consider "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 US at 199. We consider first whether the victim in this case had a sufficient opportunity to view the assailant. Here, the victim saw the assailant twice: for three seconds approximately 15 minutes before the assault, and then again for six or seven seconds during the assault. During the robbery, the assailant was about two feet from the victim. The victim testified that he got a good look at the assailant's face. It was dark at the time of the assault, but the victim testified that he was able to look at the assailant's face, clothing, and gun. The victim consistently described the assailant as young, dark-skinned, approximately the same size as the victim, which was 5 feet 9 inches tall, and wearing a black hood. The victim first

-4-

described the assailant as being the victim's own weight, about 145 pounds. The officer testified that the victim later said the assailant was 200 pounds. But even with this discrepancy, the victim indisputably had the opportunity to observe the assailant, if only for a short time.

The second factor is the witness's degree of attention. In this case, the witness testified that during the brief encounter, he was able to note the assailant's size, age, skin-tone, clothing color, the color and kind of gun being used, and that the assailant held the gun in his right hand. With regard to the third factor, the accuracy of the prior description, there is no dispute that the victim's description matched defendant. The description was general and could apply to many people, but was in fact accurate. Fourth, with regard to the level of certainty at the time of identification, the victim identified the person in the photograph as the assailant within a few seconds of seeing the photograph, which suggests some certainty. The victim also had an emotional response when first seeing the photograph, immediately getting tears in his eyes and stating that the photograph was that of the assailant. The victim never failed to identify defendant and never identified anyone other than defendant. Finally, with regard to the length of time between the crime and the confrontation, the identification occurred approximately a half hour to an hour after the crime.

We also consider in this case that the officer showing the victim the picture asked "was this him" but did not state that the person pictured was the assailant or was under arrest. The photograph itself is simply a color photograph of a young man standing near a building, but in no way indicates that the person pictured is under arrest. Indeed, the defendant appears to be smiling in the photograph. Thus, although a single-photo show-up is always suggestive, a review of the totality of the circumstances in this case demonstrates that the identification procedure was not impermissibly suggestive. We therefore conclude that the photographic identification was not subject to suppression as a violation of due process.

We note that a single-photograph identification may, in some cases, be comparable to other identification procedures, such as on-the-scene identification, that are not per se impermissibly suggestive. This Court has held that prompt, on-the-scene identifications are "reasonable, indeed indispensable, police practices because they permit the police to immediately decide whether there is a reasonable likelihood that the suspect is connected with the crime and subject to arrest, or merely an unfortunate victim of circumstance." *People v Libbett*, 251 Mich App 353, 361; 650 NW2d 407 (2002), quoting *Winters*,[5] 225 Mich App at 728. "Whatever the perceived problems of on-the-scene confrontations, it appears to us that prompt confrontations will, if anything, promote fairness by assuring greater reliability." *Id*.

For example, in *Libbett*, 251 Mich App at 361, the victim was carjacked by two individuals. The two assailants picked up two more individuals and drove around for approximately an hour before being spotted by police. After a car chase, the four occupants were apprehended, and the victim was taken to the scene to identify the suspects. This Court

---

[5] *Winters* involved a challenge regarding the right to counsel during a line-up and not the issue of whether the identification procedure was so suggestive as to be impermissible under a due process analysis.

concluded that it was reasonable for the police to bring the victim to the scene to identify whether any of the four individuals were the perpetrators, and that the on-the-scene identification did not violate the defendant's rights. *Id*.

In *Neil*, 409 US at 195, the police conducted a single person show-up with the defendant after they were unable to find anyone in the city jail or city juvenile home fitting the defendant's description. The Court determined that even though the procedure was suggestive, there was no substantial likelihood of misidentification where the victim had spent up to a half hour with the assailant, there was adequate lighting, the victim faced the assailant directly and intimately while being raped, the victim provided a thorough description of the assailant to the police, including "the assailant's approximate age, height, weight, complexion, skin texture, build, and voice," and the victim had an unusual opportunity to observe and identify her assailant. *Id*. at 199-201. Although there was a lapse of seven months between the crime and the confrontation, the victim never made a previous identification and her record for reliability was good. *Id*. at 201.

In *Stovall v Denno*, 388 US 293, 302; 87 S Ct 1967; 18 L Ed 2d 1199 (1967), overruled in part on other grounds in *Griffith v Kentucky*, 479 US 314; 107 S Ct 708; 93 L Ed 2d 649 (1987), a single suspect was shown to the victim in person in her hospital room. The Supreme Court found no due process violation because the victim was the only person who could exonerate the defendant and no one was sure how long she would live. The Court concluded that "an immediate hospital confrontation was imperative." *Id*.

In this case, the trial court rejected the argument that the showing of a single photograph can be analogized to showing a witness an actual person. We see no such distinction. True, photographs and actual people are not exactly the same thing; showing a witness an array of photographs and showing a witness an array of actual people in a line-up each has its own potential hazards to the identification process. But the harm that must be guarded against is the same, namely, the potential for mistaken identification that arises when law enforcement singles out a suspect, thereby suggesting to the witness that the person singled out is considered by law enforcement to be the perpetrator. Such "singling out" can occur either in person or by photograph.

The showing of a single photo in this case was comparable to an on-the-scene identification. Here, within minutes of the crime occurring, defendant was located across the street from the scene of the robbery and shooting. Though the victim's description was a general one, defendant matched that description. There is no dispute that under these circumstances the police could have permissibly attempted an on-the-scene identification if the victim had not been in need of immediate medical care. But under the circumstances it was not advisable for the police to keep the victim at the scene while they looked for suspects. Instead, upon determining that there was a suspect at the scene, police took the suspect's photograph and immediately took

the photograph to the victim at the hospital. The alternative would be to keep an injured victim at the scene for identification of potential suspects despite the need for medical attention[6].

The prosecution also argues that the circuit court clearly erred by suppressing the victim's subsequent in-court identification of defendant because the victim had an independent basis for that identification. We need not reach this issue in light of our resolution of the first issue.

Reversed and remanded. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Deborah A. Servitto

---

[6] And it would be ironic indeed if unharmed victims were permitted the opportunity for immediate identification of a suspect because on-the-scene identification is permitted, while victims injured by their assailants are penalized because there is no permissible method for the injured victim to see the suspect. If that were the case, an assailant would do well to incapacitate his or her victim because a hospitalized victim could not immediately identify their assailant, whereas an uninjured victim could participate in on-the-scene identification.