# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MICHAEL THORN ANDERSON,

        Defendant-Appellant.

UNPUBLISHED
June 27, 2017

No. 330652
Lenawee Circuit Court
LC No. 15-017381-FC

Before: SAWYER, P.J., and SERVITTO and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of first-degree murder, MCL 750.316(1)(a) (premeditated). He was sentenced to life imprisonment without parole for his first-degree murder conviction, with 473 days of jail credit. We affirm.

## I. FACTUAL BACKGROUND

This appeal arises from the murder of Larry Smith, an elderly man with numerous health problems, on July 20, 2014.

In early 2014, defendant and paraplegic Alison Kalbarchick[1] lived in a trailer located on property owned by Alison behind Smith's house. Defendant was Alison's full-time caregiver as well as her boyfriend or "common law husband." Defendant and Alison's only source of income was the public assistance that she received, and she and the defendant were frequently delinquent on property taxes and utility bill payments.

In March or April 2014, Alison and defendant were evicted from the property where they were living, and Smith allowed them to rent a space in his home. Barbara Minnick, Smith's sister, testified that Smith was looking for a caretaker who would assist with caring for his dogs and would cook for him, as he lived alone. According to Barbara, defendant and Alison agreed to pay rent and help with those tasks when they moved in with Smith.

---

[1] A witness with the same last name as another witness will be referred to using his or her first name.

-1-

In June 2014, Smith decided to initiate eviction proceedings against defendant and Alison because they were not paying rent. Defendant intended to challenge the eviction, as he believed that he and Alison did not need to pay rent because Smith's home was in foreclosure and Smith was not paying his mortgage payments. Animosity grew between Smith and defendant, and both men would say negative things or make accusations about each other. As discussed later in this opinion, Smith also told numerous witnesses that defendant was not taking care of him, was not feeding him, and had physically hurt him. Additionally, Smith told several witnesses that he was scared of defendant, and he frequently exhibited physical manifestations of this fear. However, Alison testified at trial that defendant would help Smith, and that she had never seen defendant harm or threaten Smith. She also stated that Smith never told her that he was afraid of defendant, and Smith never seemed fearful of him.

After initiating the eviction proceedings in the district court in June 2014, Smith returned to the courthouse several times. Each time, he appeared visibly afraid and distressed, and he repeatedly asked for help with getting defendant and Alison out of his home as soon as possible. Staff at the district court assisted Smith with filling out the court documents and called the Area Agency on Aging on his behalf because they found Smith's demeanor and statements about his living situation so concerning. Additionally, the police were called to Smith's home on several occasions in June and July to address disputes that had arisen between Smith and defendant, as well as Smith's claims that defendant had threatened or harmed him. In the weeks prior to the eviction hearing, Smith (1) told several people that defendant was mistreating or threatening him, (2) replaced his bedroom door with a steel door, and (3) stored food at a neighbor's house, explaining that he needed to hide it from defendant and Alison. Smith also filed for a personal protection order ("PPO") against defendant, but the circuit court denied it.

Ultimately, friends and family members were unable to contact Smith during much of the weekend on July 19, 2014, and July 20, 2014. When Barbara and a neighbor separately stopped at Smith's house to check on him and inquire about other matters on July 20, 2014, defendant met each of them outside and acted in an unusual manner. Each time, defendant told the visitors, among other things, that Smith left on Friday and had not returned.[2]

Barbara was suspicious after her encounter with defendant, so she immediately went to her other brother's house nearby. After consulting with him, she called the police. Deputy David Batterson spoke with Barbara around 7:00 or 7:30 p.m. on July 20, 2014. He later went to Smith's residence at approximately 9:00 p.m. When Batterson arrived, defendant told him that he had not seen Smith since Friday and had no idea where Smith was.

Sergeant Kraig Kourt met Deputy Batterson at Smith's residence. Batterson and defendant were talking inside about Smith's whereabouts when Kourt arrived. Kourt heard defendant tell Batterson that no one else was at the house that weekend and that he had been there all weekend. While Kourt was listening to the conversation, he noticed drops of blood leading from the kitchen to a heavy door nearby. Kourt interrupted the dialogue and asked

---

[2] However, other neighbors testified at trial that they had briefly seen Smith at his property or driving nearby on Saturday, July 19, 2014.

defendant which room was behind the heavy door. Defendant identified the room as Smith's bedroom. Kourt checked the door knob, discovered that it was unlocked, and opened the door. Smith was lying inside in a pool of blood that looked wet, shiny, and "reasonably fresh." Kourt testified that he remembered defendant saying, in surprise, " 'He's in there?' " However, Kourt thought that defendant's surprised demeanor seemed fake and did not make sense in light of defendant's claim that he was home all weekend. Kourt testified that, after the body was discovered, defendant did not ask any questions about Smith and did not show any concern for him.

A small dog was also inside Smith's bedroom, but there were no dog feces. The room had been ransacked, and Kourt thought it "looked like a staged robbery." The police, paramedics, and medical examiner estimated, based on several factors, that Smith had been dead for approximately four to seven hours before Kourt found him at 9:30 p.m.

When Kourt left Smith's room, he "look[ed] at the table and . . . notice[d] [there was] a piece of like the top of a chain-link fence, like a [sic] the part that you would 't', like the 't' part where you would bring the post and crossbar together," which seemed out of place to Kourt. Kourt found the fence piece significant since the cause of Smith's injuries appeared to be "force blunt trauma," and the dog kennels on Smith's property were built with that kind of fence. There were no other parts nearby.

Ultimately, the police took defendant to a patrol car. He agreed to speak with Batterson and waived his *Miranda* rights, even though he was not in custody. During that interview, as well as subsequent interviews, defendant consistently denied any involvement in the murder. Defendant told Batterson that he was home from approximately 6:00 p.m. on Friday evening through the time that Barbara came to the house on Sunday, and he never left the house. Defendant also said that no one else came to the house.[3] That night, the police located Smith's wallet after defendant told the police that it was located near the chicken coop on the property, explaining to the police that he had last seen Smith in that area.

Two days later, defendant told Batterson that he knew where the keys to Smith's car were located, even though defendant had previously implied that Smith had left the house in his car on Friday. Additionally, during subsequent police interviews, defendant provided inconsistent statements regarding the last time that he saw Smith. He also provided inconsistent statements regarding Smith's car. Defendant first said that he had not seen Smith since Friday and did not mention the car, but he later said that Smith's car was at the house and that defendant put it in the

---

[3] Although the record is unclear, it appears that defendant later contradicted this statement, describing a different scenario involving "a little red truck" and the "Silver Lake Boys," a group including Smith which participated in illegal or suspicious activity, according to defendant. Detective Gary Ward testified that throughout his investigation, "nobody knew anything about the Silver Lake boys," and there was no evidence that supported what defendant said about them. Rather, the general understanding was that they "were the old guys who lived on Silver Lake Highway that were all friends."

garage. During the interviews with Batterson, defendant expressed anger toward Smith, but explained that he was mostly angry about how "this" was going to affect Alison.

Dr. Bader Cassin, the Lenawee County Medical Examiner, performed the autopsy on Smith's body on July 22, 2014. The cause of death was multiple blunt force injuries to the head or "blunt trauma . . . to [the] skull." However, Smith also had recently-inflicted wounds on his leg, arm, back, shoulders, head, and face, as well as older wounds on his legs. Based on their features, Dr. Cassin believed that the injuries were inflicted "by a long object that probably was a little bit flat or blunt at the point of impact, but not so flat or broad that it was wider than you see [sic]." Dr. Cassin testified that the pictures of the fence pipe proffered by the prosecution could be consistent with the long, dowel-type object that may have caused Smith's death and his other injuries.

Following the discovery of Smith's body, several police officers, forensic scientists, and forensic analysts collected and analyzed evidence from the scene, as well as evidence from cell phones associated with Smith, defendant, and Alison. In addition, David Yount, the canine unit commander for the Michigan State Police in Lansing, took a cadaver dog to Smith's residence to execute a search warrant on September 3, 2014. The dog detected human remains in a large pile of clothing. When Yount searched through the pile of clothing, he "found what appeared to be a sweatshirt, a fleece with blood -- looked like blood on it, a lot of blood on it and other material." The dog did not locate anything else inside the house. Outside, the dog expressed interest in the dog kennel. Yount testified that there "[a]bsolutely" was a change in the dog when it was near the kennel, which was different than the signs that it usually displayed when it smelled another animal or food. This change in the dog's demeanor prompted Yount to search the area. Yount found a pipe on top of the plywood roof of the dog kennel underneath another piece of plywood.[4] The pipe was approximately 28 inches long.[5]

---

[4] The prosecution believed that the pipe was the murder weapon.

[5] No blood or DNA was found on the pipe. At trial, Detective Ward testified:

> [A]nother thing that it's probably important to mention is . . . on the kitchen/dining room table within the residence when we were there that very first night when we gained entry to the residence after the crime lab had finished, on the dining room table was the opposite "t" connection to the missing "t" connection to the opposite end of that pipe. I thought that it was extremely -- as an investigator I thought it was extremely strange to walk into this house and to have just the "t" connection by itself laying on the kitchen table with no other end. I did – we did look at all the dog kennels on the property, we could not find a location where that other end of pipe went. So, therefore, we found just the "t" connection by itself laying on the dining room table and never found the pipe.
>
> So when we found the pipe, that's what give that pipe so much relevance as possibly being that weapon because the other half was on the inside and why wouldn't the other end of that pipe be there also? Why would it be hid[den] under a piece of plywood?

A forensic analyst reviewed communication events from phones associated with Smith, Alison, and defendant between July 18, 2014, and August 15, 2014. He identified anomalies in the calling pattern of defendant's phone on July 18, 19, and 20, including that there was a break in defendant's "consistent, regular, heavy usage" between 2:48 p.m. and 5:07 p.m. on July 20, 2014. The analyst also stated, in light of earlier testimony about the content that was found on Alison's phone, that "[t]here were several, dozens of text messages to and from [Alison's] phone that should have been in this physical dump [of defendant's phone]. And the only explanation if there was no incoming but there were outgoing is that someone . . . deleted those text messages." He similarly testified that the fact that nothing was found on defendant's phone did not match the phone records, which showed numerous calls up until July 20, 2014, indicating that someone either deleted the information or the information was lost as the result of a "severe malfunction." The analyst believed it was more likely that the cause was "someone wiping or performing a soft reset, factory reset, hard reset, and wiping that information off the phone."

At trial, DeAndrew Woodard testified that he met defendant in December 2014 while incarcerated in the Lenawee County Jail. Woodard and defendant would talk on a day-to-day basis and got to know each other well, both in person and through written notes conveyed by other inmates. They began talking about "the revolution" and shared their backgrounds with each other in order to develop trust. Woodard testified that defendant ultimately made the following statements during one of their trust-building conversations in the context of developing the "revolution":

> And I'm like, "What does that mean"? He said he couldn't talk about it really. I'm like, "Look, either you -- you know, you're about it or you're not."
>
> And he's like, "Well, you know, you know a dude named Larry Smith?"
>
> I'm like, "No."
>
> He was like, you know, "Well, I killed the -- killed the f***er."
>
> And I'm like, "Well, for what?"
>
> He was like, "We was doing business, you know. He betrayed me. You know, you kill my dog, you kill my cat, that sort of thing. You know, we from New York, that's how we get down. We show up with a hundred New York niggers all with blow torches."
>
> And that was really kind of like, really, you know, it wasn't nothing elaborate or anything about it.

Woodard testified that defendant did not give a reason for murdering Smith during their conversations other than that Smith had betrayed him. At trial, Woodard repeatedly acknowledged that he provided Detective Gary Ward information about defendant and another

-5-

inmate and testified at defendant's trial because he wanted to help himself, but he had not received any promises or deals from the prosecutor's office in exchange for his testimony.[6]

At trial, Alison testified that she was not aware of any confrontations or interactions between Smith and defendant during the weekend of Smith's death. However, she spent much of her time playing videogames in her bedroom with her door shut and the volume on high. She also testified that defendant spent most of the day in her room on Sunday, July 20, 2014.

The defense presented evidence from one of Smith's neighbors that Smith would have many visitors "at times," including some late at night. It also presented testimony from Dr. Francisco Diaz, an assistant medical examiner from the Wayne County Medical Examiner's office. Dr. Diaz agreed that the cause of death was "inflicted blunt force injury." He also had "no doubt" that the pipe found on top of the dog kennel could have been used to inflict the injuries on Smith's skull. However, he did not believe that the pipe was used to inflict the sharp injury to Smith's knee. Specifically, Dr. Diaz did not think that the same weapon was used to cause the injuries on Smith's knee and the injuries on his head, as he did not believe that the injury that ultimately fractured Smith's femur bone was consistent with the t-type connection on the pipe. Defendant also testified on his own behalf, denying that he killed or assaulted Smith and providing his own account of the housing arrangement and his relationship with Smith in the months and weeks leading up to Smith's death. He gave extensive testimony in refutation of the prosecution's evidence.

As discussed, the jury found defendant guilty of first-degree murder.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that his first-degree murder conviction was supported by insufficient evidence. We disagree.

## A. STANDARD OF REVIEW

We review a challenge to the sufficiency of the evidence *de novo*. *People v Henderson*, 306 Mich App 1, 8-9; 854 NW2d 234 (2014). "We examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013) (quotation marks and citation omitted). This Court's review is deferential, as "[w]hen assessing a challenge to the sufficiency of evidence, the trier of fact, not the appellate court, determines what inferences may be fairly drawn from the evidence and the weight to be accorded those inferences." *People v Malone*, 287 Mich App 648, 654; 792 NW2d 7 (2010), overruled in

---

[6] Defendant claimed that Woodard was a "rat" who made up defendant's confession. Defendant also stated that he had been attempting to mentor Woodard when he made those statements, explaining that "it was more to stress to [Woodard] that the same thing that happened to [Smith] could happen to him."

part on other grounds by *People v Jackson*, 498 Mich 246, 268 n 9 (2015); see also *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) ("The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict."). Accordingly, in reviewing a challenge to the sufficiency of the evidence, "[w]e do not interfere with the jury's assessment of the weight and credibility of witnesses or the evidence . . . ." *Dunigan*, 299 Mich App at 582.

## B. ANALYSIS

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010), citing MCL 750.316(1)(a). Additionally, "identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). Defendant only challenges the sufficiency of the evidence showing that he was the perpetrator of the crime.

The jury's verdict was supported by extensive evidence. Although there was no forensic evidence that conclusively connected defendant to the crime, the prosecution presented evidence that defendant confessed to the crime and presented overwhelming circumstantial evidence from which a rational jury could find, beyond a reasonable doubt, that defendant murdered Smith. "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of [a] crime." *Bennett*, 290 Mich App at 472; see also *People v Sullivan*, 290 Mich 414, 418; 287 NW 567 (1939) (stating that identity "may be established by circumstantial evidence alone").

Notably, "the accused's motive in committing an alleged crime is always relevant because it bears on either his identity as the perpetrator of the offense or . . . the strength of his defense . . . ." *People v Flynn*, 93 Mich App 713, 722; 287 NW2d 329 (1979); see also *People v Herndon*, 246 Mich App 371, 412-413; 633 NW2d 376 (2001) (stating that motive can be helpful to show the necessary elements of a crime, even if motive is not an essential element itself). "In cases in which the proofs are circumstantial, evidence of motive is particularly relevant." *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008).

Here, the prosecution presented extensive evidence showing that defendant had a specific reason to be angry with Smith, who was in the process of evicting him and Alison for nonpayment of rent. Notably, a court date was set for the Wednesday after Smith's death to evict defendant and Alison out of the house. It is undisputed that defendant believed that he did not need to pay rent because Smith's home was in foreclosure, Smith was not paying his mortgage payments, and defendant believed that Smith was committing "fraud" by demanding rent payments from defendant and Alison. Although there was evidence that defendant was planning to move out of Smith's residence at the time of the eviction proceedings, numerous witnesses confirmed that defendant was upset and "in a panic" about the eviction, that he intended to fight the eviction, and that he did not believe that he could pursue resources for Alison if they were evicted.

Additionally, multiple witnesses were aware that tension and animosity had developed between Smith and defendant, and that the police had been called to the house on more than one occasion in the weeks prior to Smith's death. Even Barbara, who frequently communicated with

defendant and recognized that defendant appeared to be concerned about Smith, confirmed the growing animosity between Smith and defendant. Defendant expressed that he was angry at Smith during the interviews with Deputy Batterson. Likewise, defendant's disjointed account at trial of the events giving rise to the eviction proceedings and his intent to fight the eviction reveal, at a minimum, frustration toward Smith and the way in which the landlord-tenant dispute progressed, as well as the complicated—and contradictory—relationship that he shared with Smith.

Along with the nonpayment of rent issue, numerous witnesses testified that Smith also was attempting to evict defendant and Alison—and obtain a PPO against defendant—because he was afraid of defendant, defendant and Alison were eating his food, defendant was not feeding him, and defendant was not assisting with Smith's care. Smith told several people that he was hiding his food from defendant and Alison, and Sharon Benchich and Jennifer Thomas confirmed that Smith stored food at their house because he was scared. Smith also told witnesses that defendant had pushed him and broken his cane. "[E]vidence of the prior assaults by defendant upon the victim tends to provide defendant's motive, intent or absence of accident." *People v Morris*, 139 Mich App 550, 557; 362 NW2d 830 (1984); see also *People v Orr*, 275 Mich App 587, 592; 739 NW2d 385 (2007) (citing *Morris*). Consistent with his expressions of fear and distress to others, Smith replaced his bedroom door with a secure steel door—*i.e.*, one that is typically used as the front door to a residence—approximately one month before his death. Moreover, police officers and court employees suggested that Smith pursue a PPO against defendant in light of Smith's statements about what was occurring inside his home.[7]

Similarly, "evidence of [a] defendant's prior threats against the victim [are] highly probative evidence of his motive and identity in the killing of the victim." *People v Armentero*, 148 Mich App 120, 133; 384 NW2d 98 (1986). Numerous witnesses testified that Smith said that defendant had threatened him and that he was afraid that defendant would hurt or kill him, partially due to defendant's proficiency in martial arts. Family members, friends, police officers, court employees, and adult protective services workers recounted numerous conversations with Smith regarding the extent of his fear of defendant, the fact that he was afraid to be inside his home, and the steps that he had taken to protect himself from defendant.

Other circumstantial evidence also provides substantial support for a finding that defendant committed the crime. Defendant consistently maintained that he was in the house from approximately 6:00 p.m. on Friday evening through the time that Barbara came to the house on Sunday, that he never left the property, and that no one came to the house except family members. Alison similarly testified that defendant was home the entire weekend, as far as she knew. Accordingly, it is apparent that defendant had a clear opportunity to commit the crime.

Following the lead of the cadaver dog, police found a fence pipe on top of the plywood roof of the kennel underneath another piece of plywood. That location was within a few feet of where Timothy Rice saw an African-American male at approximately 3:00 p.m. on Sunday, July 20, 2014, who did not wave when Rice waved and, instead, "kind of cupped his arm . . . [to]

---

[7] Smith filed a petition for a PPO, but it was denied.

block his face." As Detective Ward noted, it appears significant that the opposite end of the pipe was found on the dining room table on the night of the murder, especially given Kourt's observation that there were no other parts nearby, which could have indicated that someone was working on the part inside. Additionally, Dr. Cassin testified that the pictures of the pipe could be consistent with the long, dowel-type object that may have caused Smith's death and his other injuries.[8] Considered together, a jury could reasonably infer from this evidence that defendant had easy access to the likely murder weapon in this case.

Further, medical professionals and law enforcement personnel consistently estimated that Smith's death occurred approximately four to seven hours before his body was found (*i.e.*, approximately between 2:00 and 5:00 p.m.). Correspondingly, one of the abnormalities in the calling pattern of defendant's phone was a break in his "consistent, regular, heavy usage" between 2:48 p.m. and 5:07 p.m. on July 20, 2014.

Although the recordings of Batterson's interviews with defendant were not provided for our review on appeal, it appears from the trial transcript that defendant's explanations for how the murder may have occurred were nonsensical and unsupported by any other data or evidence. Defendant also provided conflicting stories to visitors and investigators regarding the location of Smith's car and whether he had seen it or moved it during the weekend. Notably, a jury could infer from the fact that defendant told the police where to find Smith's wallet[9] and keys that defendant had more knowledge regarding Smith's whereabouts during the weekend than he claimed at trial. Considered in conjunction with the other evidence, Barbara's and Thomas' testimony regarding their unusual encounters with defendant provides further evidence from which the jury could infer that defendant did not want other individuals to come near the house on July 20, 2014, the day of the murder.

Defendant told visitors that Smith lost his cell phone, and the police never located the cell phone that Smith was using immediately prior to his death. However, during a search of the property, the police found what appeared to be a cell phone in the fire pit, which appeared consistent with the pictures of Smith's phone on the empty phone boxes seized from Smith's car. Barbara testified that it was unlike Smith to go without a phone for days, suggesting that Smith would have taken action if he had "lost" his phone.

Significantly, when defendant's cell phone was recovered, there was no data contained within it. An analyst testified that the fact that nothing was found on defendant's phone was inconsistent with the cell phone records, which showed many calls up until July 20, 2014. The experts testified that it was most likely that someone had reset or wiped the information from

---

[8] Although Dr. Diaz believed that it was more likely that an instrument other than the pipe caused the injury to Smith's femur bone, he had "no doubt" that the pipe could have been used to inflict the injuries on Smith's skull.

[9] Although defendant claimed that this knowledge was based on where defendant last saw Smith before his death, this Court must view the evidence in the light most favorable to the prosecution. *Dunigan*, 299 Mich App at 582.

defendant's phone. Additionally, text messages that were, in fact, sent from defendant's phone to Alison's phone, according to the logs kept by the cell phone company and data pulled from the phones, had been deleted on Alison's phone.

Lastly, Woodard testified that defendant confessed that he murdered Smith while Woodard and defendant were in jail together. It is significant that the language recounted by Woodard was consistent with the way in which Stephanie Caulkins had heard defendant threaten Smith. Specifically, both witnesses' accounts of defendant's statements included references to the way in which conflict is handled in New York, and defendant acknowledged at trial that he came to the Midwest from New York in 2008.

In sum, it was the jury's responsibility, in assessing the weight of the evidence and the credibility of the witnesses, to determine whether (1) to credit the circumstantial evidence of identity proffered by the prosecution and Woodard's account of defendant's confession, or (2) to credit defendant's trial testimony. See *Dunigan*, 299 Mich App at 582. The facts in this case give rise to a series of reasonable inferences concerning defendant's identity as the murderer, flowing from defendant's motive, behavior, and opportunity to kill Smith, as well as other unusual circumstances from the weekend of Smith's death. See *Nowack*, 462 Mich at 400. Although most of the links in the prosecution's chain of evidence against defendant are circumstantial, the combined inferences flowing from the evidence are neither speculative nor irrational, and they plainly provided a basis for the jury to rationally conclude beyond a reasonable doubt that defendant committed the murder. See *Dunigan*, 299 Mich App at 582.

Defendant denied any involvement in Smith's murder at trial, and his testimony largely consisted of explanations for, or alternative framings of, the prosecution's evidence. Again, however, this Court must "draw all reasonable inferences and make credibility choices in support of the jury verdict." *Nowack*, 462 Mich at 400.

Defendant's sufficiency of the evidence claim must fail.

## III. GREAT WEIGHT OF THE EVIDENCE

Next, defendant argues that his first-degree murder conviction was against the great weight of the evidence. We disagree.

### A. STANDARD OF REVIEW AND APPLICABLE LAW

Defendant failed to preserve this claim by moving for a new trial in the trial court.[10] *People v Cameron*, 291 Mich App 599, 617-618; 806 NW2d 371 (2011). Thus, our review of this issue is limited to plain error affecting defendant's substantial rights. *Id*. at 618; see also *People v Musser*, 259 Mich App 215, 218; 673 NW2d 800 (2003). To demonstrate plain error, a

---

[10] On July 23, 2015, defendant filed a motion to remand with his brief on appeal, which this Court denied. *People v Anderson*, unpublished order of the Court of Appeals, issued August 18, 2016 (Docket No. 330652).

defendant must show that (1) an error occurred, (2) the error was clear or obvious, and (3) "the plain error affected [the defendant's] substantial rights," which "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Even if a defendant establishes a plain error that affected his substantial rights, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764 (quotation marks and citation omitted; second alteration in original).

> The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v McCray*, 245 Mich App 631, 637; 630 NW2d 633 (2001). . . . "[U]nless it can be said that directly contradictory testimony was so far impeached that it 'was deprived of all probative value or that the jury could not believe it,' or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *Id.* at 645-646 (citation omitted). [*Musser*, 259 Mich App at 218-219 (second alteration in original).]

Likewise, "[g]enerally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). In most cases, "conflicting testimony or questions concerning the credibility of the witnesses are not sufficient grounds for granting a new trial." *People v Brantley*, 296 Mich App 546, 553; 823 NW2d 290 (2012). See also *People v Lemmon*, 456 Mich 625, 642-647; 576 NW2d 129 (1998); *Unger*, 278 Mich App at 232.

## B. ANALYSIS

Under this issue, defendant incorporates by reference his arguments from his sufficiency of the evidence claim. For the same reasons previously discussed, given the overwhelming evidence presented by the prosecution, the jury's verdict was not against the great weight of the evidence.

However, defendant also argues that "Larry Smith's various reports of his fear of Mr. Anderson were a huge part of the circumstantial case. To the extent this fear was the product of his mental difficulties, the verdict is against the great weight of the evidence." Contrary to defendant's claims, whether Smith's fear of defendant resulted from "mental difficulties" was a question of witness credibility for the jury to decide in light of the conflicting evidence in the record. Evidence was presented regarding defendant's demeanor and reputation that contradicted Smith's statements to others about defendant and Caulkins' testimony. For example, witnesses frequently recognized defendant's dedication to Alison's care and indicated that he was polite during their encounters with him. Evidence also was presented that elevated ammonia levels or encephalopathy may have impacted Smith's mental status on certain occasions. However, numerous individuals testified that Smith did not seem confused, forgetful,

or out of touch with reality, despite his health problems. Instead, witnesses stated that they perceived Smith to be scared and "a nervous wreck," not mentally or psychologically unstable.

Further, as defendant notes in his brief, Smith's testimony was analogous to Caulkins' testimony. Although defendant claims that Caulkins had her own mental difficulties as well, there is no indication that Caulkins' testimony, Smith's statements before his death, and other witnesses' recollections of Smith's demeanor were "so far impeached that [this evidence] 'was deprived of all probative value or that the jury could not believe it,' or [that it] contradicted indisputable physical facts or defied physical realities . . . ." *Musser*, 259 Mich App at 219. Thus, we must defer to the jury's assessment of the witnesses' credibility. *Brantley*, 296 Mich App at 553; *Musser*, 259 Mich App at 219.

Defendant also appears to argue that the verdict was against the great weight of the evidence in light of the proceedings, or lack thereof, involving Woodard's criminal charges. Defendant appears to claim that the verdict was against the great weight of the evidence because the jury was unable to fully evaluate Woodard's credibility given the fact that it was not informed of the prosecution's future plans for Woodard's case. Again, however, generally speaking, "conflicting testimony or questions concerning the credibility of the witnesses" are not sufficient grounds for granting a new trial. *Brantley*, 296 Mich App at 553. Likewise, in raising this confusing argument, defendant fails to explain how Woodard's testimony "was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities . . . ." *Musser*, 259 Mich App at 218-219.

Thus, defendant has failed to establish a plain error affecting his substantial rights. See *Carines*, 460 Mich at 763. The jury's verdict was not against the great weight of the evidence.

## IV. PROSECUTORIAL MISCONDUCT

Defendant claims that the prosecution committed misconduct and violated his due process rights when it failed to reveal the deal offered to Woodard and proffered an excessive amount of bloody evidence. We disagree.

### A. STANDARD OF REVIEW

All of defendant's prosecutorial misconduct claims are unpreserved or waived.[11] Unpreserved claims of prosecutorial misconduct and unpreserved evidentiary claims are

---

[11] "In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *Bennett*, 290 Mich App at 475. Defendant did not object to any of the purported instances of prosecutorial misconduct identified on appeal. Thus, defendant's claims are unpreserved.

Two other preliminary matters are worth noting with regard to defendant's claims concerning the evidence admitted during Detective Ward's testimony. First, defendant's claim with regard to this evidence appears to be an evidentiary claim disguised as a claim of

reviewed for plain error affecting the defendant's substantial rights. *Bennett*, 290 Mich App at 475-476; *People v Ackerman*, 257 Mich App 434, 446; 669 NW2d 818 (2003). In addition to the principles applicable to the plain error standard of review previously discussed, "[this Court] cannot find error requiring reversal [based on a claim of prosecutorial misconduct] where a curative instruction could have alleviated any prejudicial effect." *Bennett*, 290 Mich App at 476 (quotation marks and citations omitted; alteration in original). See also *Unger*, 278 Mich App at 234-235.

## B.  ANALYSIS

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014) (quotation marks and citation omitted). This Court reviews prosecutorial misconduct claims on a case-by-case basis, examining the prosecutor's remarks in context. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010); *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007).

First, there is no basis in the record for concluding that the prosecution committed misconduct or denied defendant a fair trial by (1) giving Woodard "the deal of a lifetime," (2) "dragging [its] heels until [defendant's] case ha[d] concluded, in order to avoid having the jury instructed that any deal could be used to evaluate Mr. Woodard's credibility" consistent with M Crim JI 5.13, or (3) otherwise failing to reveal "whatever deal Mr. Woodard received . . . ." Woodard repeatedly testified that (1) no one from the prosecutor's office promised him anything in exchange for his testimony at defendant's trial, (2) he did not know whether the prosecutor was going to offer him anything in the future, and (3) neither a plea nor a trial were pending in his case at the time of defendant's trial. Defendant has failed to cite any authority indicating that the prosecutor had an obligation to disclose during defendant's trial any future plans related to Woodard's case that had not yet been revealed to Woodard. Moreover, there is no evidence in the record from which we could conclude that the prosecution withheld information in order to preclude the jury from fully evaluating Woodard's credibility.[12] Defendant offers pure prosecutorial misconduct. Nevertheless, because he failed to object to the admission of the evidence on any ground, his claims are unpreserved and subject to the same standard of review regardless of the way in which they are framed. See *Bennett*, 290 Mich App at 475; *People v Ackerman*, 257 Mich App 434, 446; 669 NW2d 818 (2003).

Second, defendant waived any error related to the admission of the evidence during Detective Ward's testimony, whether on the basis of an evidentiary error or prosecutorial misconduct. Defense counsel expressly stated that he had no objection to each of the exhibits admitted by the prosecution. A party's affirmative statement that it has no objection to the admission of evidence constitutes a waiver. *People v Kowalski*, 489 Mich 488, 504-505; 803 NW2d 200 (2011); *People v McDonald*, 293 Mich App 292, 295; 811 NW2d 507 (2011). Further, based on the discussion between the trial court and the parties' attorneys at the beginning of the trial, it appears that the defense may have stipulated to the admission of the photographs admitted by the prosecution.

[12] We will not consider the screenshot of Woodard's current status on the Michigan Department of Corrections website, which was attached as an exhibit to defendant's brief on appeal. "[I]t is

-13-

speculation, which cannot serve as a basis for granting a new trial based on prosecutorial misconduct.

Defendant also has failed to establish a plain error affecting his substantial rights. The record clearly shows that any alleged error in this regard did not affect the outcome of the proceedings. See *Carines*, 460 Mich at 763. The gravamen of defendant's claim is that the prosecution's delay in negotiating with Woodard, or failure to disclose any deal that it had made with Woodard, precluded the jury from fully evaluating Woodard's credibility in accordance with the principles for evaluating credibility described in M Crim JI 5.13. Such an instruction was not provided in this case based on the fact that there was no testimony that Woodard had been offered an agreement in exchange for his testimony.[13] However, Woodard's testimony, the attorneys' questions, and the attorneys' arguments comprehensively presented, for the jury's evaluation, facts that could undermine Woodard's credibility, including his explicit self-interest in testifying and hope to secure a deal through his testimony at defendant's trial.

As defendant acknowledges in his brief on appeal, "Woodard was candid about his reason for testifying." Woodard testified that he met defendant in December 2014 while incarcerated in the Lenawee County Jail. He had been charged with first-degree home invasion and two counts of assault with intent to commit robbery while armed, and he acknowledged that the charges carried a maximum potential sentence of life in prison. Most significantly, Woodard acknowledged that he gave Detective Ward information about defendant and another inmate because he wanted to help himself. Woodard testified that Detective Ward indicated that he could not do anything for Woodard or make any promises, but he would put in a good word for Woodard. Woodard expressly stated that one of his motivations for revealing defendant's confession was helping himself in light of his pending criminal case.

Defense counsel had an extensive opportunity to cross-examine Woodard. Counsel questioned Woodard regarding the details of his case, whether he had a trial or plea "coming up," and whether his case had "been resolved yet." Woodard acknowledged that he told Detective Ward that he "knew how this stuff worked," and confirmed that he was referring to the fact that he "was looking to help [his] situation."[14] Woodard reiterated that he told Detective Ward that he wanted to give him some information and specifically stated the personal benefit that he hoped to receive from providing that information. Defense counsel repeatedly elicited testimony on cross-examination that the prosecution had not yet offered anything to Woodard, and that Woodard hoped that his testimony during defendant's trial would benefit him in his case and "the system will help [him]." Thus, because Woodard's intentions were clearly presented to the

---

impermissible to expand the record on appeal." *People v Powell*, 235 Mich App 557, 561 n 4; 599 NW2d 499 (1999); see also MCR 7.210(A)(2). Nevertheless, contrary to defendant's claims, the current status of Woodard's case has no bearing on whether the prosecutor's conduct denied defendant a fair trial during his case.

[13] The applicability of M Crim JI 5.13 is further discussed later in this opinion.

[14] However, Woodard also testified that he was not looking to help his situation during his conversations *with defendant*.

jury, defendant has failed to establish that the prosecutor's purported failure to disclose the status of Woodard's case constituted a plain error affecting his substantial rights.

Next, as discussed, defendant waived his claims regarding the admission of the "bloody evidence." *Kowalski*, 489 Mich at 504-505; *McDonald*, 293 Mich App at 295. Nevertheless, defendant has failed to establish a plain error affecting his substantial rights.

As defendant emphasizes, the crucial issue at trial was whether defendant committed the murder. As defendant recognizes in his brief on appeal, Detective Ward acknowledged that none of the evidence introduced during his testimony conclusively connected defendant to the crime. This acknowledgement likely reduced the prejudicial effect of the evidence admitted during Ward's testimony. Moreover, as explained, circumstantial evidence proved beyond a reasonable doubt that defendant was the perpetrator of the murder. Thus, this Court need not consider whether the prosecutor committed misconduct in introducing this evidence, or whether the trial court's admission of the evidence was erroneous, as defendant cannot show that the purported error affected the outcome of the trial. See *Carines*, 460 Mich at 763.

## V. JURY INSTRUCTIONS

Defendant argues that his rights to due process and a fair trial were violated when the trial court failed to properly instruct the jury. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

As an initial matter, defendant waived his right to appeal any instructional error when defense counsel expressly affirmed the trial court's instructions. Waiver is "the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Id.* (quotation marks and citation omitted). "When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a waiver." *Kowalski*, 489 Mich at 503.

Even if this issue had not been waived, it is, at best, unpreserved, as a party must object or request a particular jury instruction before the jury deliberates to preserve an instructional error for review. MCR 2.512(C); *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003), disapproved on other grounds 496 Mich 967 (2003); *People v Sabin*, 242 Mich App 656, 657; 620 NW2d 19 (2000). Again, our review of unpreserved issues is limited to plain error affecting defendant's substantial rights. *People v Jackson*, 313 Mich App 409, 421; 884 NW2d 297 (2015); see also *Sabin*, 242 Mich App at 657 ("Absent an objection or request for an instruction, this Court will grant relief only when necessary to avoid manifest injustice.").

### B. ANALYSIS

Jury instructions are to be read as a whole rather than extracted piecemeal to establish error. *Kowalski*, 489 Mich at 501. They "must clearly present the case and the applicable law to the jury. The instructions must include all elements of the charged offenses and any material issues, defenses, and theories if supported by the evidence." *People v McGhee*, 268 Mich App

600, 606; 709 NW2d 595 (2005) (citations omitted). "[A]n imperfect instruction is not grounds for setting aside a conviction if the instruction fairly presented the issues to be tried and adequately protected the defendant's rights." *Kowalski*, 489 Mich at 501-502; see also *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002) ("No error results from the absence of an instruction as long as the instructions as a whole cover the substance of the missing instruction.").

Defendant contends that he was denied due process when the jury was improperly instructed. He first argues that he was entitled to a jury instruction consistent with M Crim JI 4.14. M Crim JI 4.14 provides:

> You have heard testimony about the use of a tracking-dog. You must consider tracking-dog evidence with great care and remember that it has little value as proof. Even if you decide that it is reliable, you must not convict the defendant based only on tracking-dog evidence. There must be other evidence that the defendant is guilty.

The prosecution concedes that this Court previously held in *People v Perryman*, 89 Mich App 516, 524; 280 NW2d 579 (1979), that when tracking-dog evidence has been admitted at trial, the "court has a duty, even absent a request by counsel, to inform the jury that tracking dog evidence: must be considered with caution; is of slight probative value; and if found reliable, cannot support a conviction in the absence of other direct evidence of guilt." However, subsequent panels of this Court have found that a trial court's failure to give a cautionary instruction on tracking-dog evidence was harmless error. *People v McMillen*, 126 Mich App 211, 214; 336 NW2d 895 (1983); *People v McRaft*, 102 Mich App 204, 210-211; 301 NW2d 852 (1980).

As previously discussed with regard to defendant's sufficiency of the evidence claim, overwhelming circumstantial evidence supported the jury's finding that defendant was the perpetrator of Smith's murder. Considering the evidence as a whole, the tracking dog evidence was insignificant. Thus, defendant is unable to demonstrate that he was prejudiced by the trial court's failure to provide M Crim JI 4.14, as the instruction merely requires that a defendant cannot be convicted *solely* based on tracking dog evidence, given the fact that tracking dog evidence has little evidentiary value, see M Crim JI 4.14, and the record clearly shows that defendant was convicted based on extensive evidence in addition to the tracking dog evidence. See *Carines*, 460 Mich at 763-764.

Next, defendant argues that he was entitled to a jury instruction consistent with M Crim JI 5.13. M Crim JI 5.13 provides:

> (1) You have heard testimony that a witness, [*name witness*], made an agreement with the prosecutor about charges against [him / her] in exchange for [his / her] testimony in this trial. You have also heard evidence that [*name witness*] faced a possible penalty of [*state maximum possible penalty*] as a result of those charges.

(2) You are to consider this evidence only as it relates to [*name witness*]'s credibility and as it may tend to show [*name witness*]'s bias or self-interest.

The instruction also includes the following use note:

This instruction should be used only where evidence has been elicited concerning the sentencing advantages of a plea or dismissal agreement offered in exchange for a witness's testimony. If that evidence relates to the same offense with which the defendant is charged, the court should reinstruct in accord with M Crim JI 2.23 that the penalty facing the defendant is not to be considered in deciding the case. [M Crim JI 5.13, Use Note.]

Notably, no evidence was elicited at trial that the sentencing advantages of a plea or a dismissal agreement had been offered in exchange for Woodard's testimony. To the contrary, as discussed, Woodard consistently testified that the prosecution had not offered him a deal or anything else in exchange for his testimony at the time of defendant's trial, even though he hoped to personally benefit in his own case from testifying against defendant. Defendant argues that he would have been entitled to the instruction "had Mr. Woodard's situation been revealed in a forthright manner by the [p]rosecutor," but, as previously discussed, there is no indication that the prosecutor improperly withheld any information pertinent to Woodard's testimony. Thus, the trial court properly omitted M Crim JI 5.13 from the jury instructions, as it was not supported by the evidence. See *McGhee*, 268 Mich App at 606 ("The instructions must include . . . any material issues, defenses, and theories *if supported by the evidence*.") (emphasis added).

Defendant counters that the trial court should have provided a modified version of the jury instruction. The primary purpose of M Crim JI 5.13, formerly CJI2d 5.13, "is to raise the jury's awareness of the potential ulterior motives of the witness" by "caution[ing] the jury that the witness may have some reason not to testify truthfully." *People v Lockett*, 295 Mich App 165, 186; 814 NW2d 295 (2012). Here, the jurors were instructed at the beginning and the end of the trial that it was their job to assess the credibility of the witnesses, and they were provided questions to consider in assessing the witnesses' credibility. Significantly, the trial court twice instructed the jury, consistent with M Crim JI 2.6, that it should consider whether the witnesses have any bias, prejudice or personal interest in how the case is decided, and whether the witnesses have any "special reason to tell the truth or any special reason to lie[.]" The parties' extensive direct and cross-examination of Woodard was more than sufficient to put the jury on notice that Woodard may have had a reason not to testify truthfully at defendant's trial, and that the jury should consider, consistent with the trial court's instructions, whether Woodard's testimony was tainted by bias or self-interest.

In sum, there is no indication that the trial court's failure to provide instructions consistent with M Crim JI 4.14 and M Crim JI 5.13 affected the outcome of the proceedings. Thus, defendant has failed to establish that the jury instructions provided by the trial court constituted a plain error affecting defendant's substantial rights, see *Carines*, 460 Mich 763; *Jackson*, 313 Mich App at 421, or resulted in manifest injustice, *Sabin*, 242 Mich App at 657.

VI. CONCLUSION

Defendant has failed to establish that any of his claims warrant relief.

Affirmed.

/s/ David H. Sawyer
/s/ Deborah A. Servitto
/s/ Michael J. Riordan